[18 NE3d 722, 994 NYS2d 22]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MARK GARRETT, Respondent.

Argued June 3, 2014; decided June 30, 2014

**POINTS OF COUNSEL**

*Thomas J. Spota, District Attorney*, Riverhead (*Anne E. Oh* of counsel), for appellant. The Appellate Division erred as a matter of law when it determined that the mere filing of a civil complaint, which is purely hearsay, triggered the People's obligation under *Brady v Maryland* (373 US 83 [1963]). (*People v Bryce*, 88 NY2d 124; *Giglio v United States*, 405 US 150; *People v Fuentes*, 12 NY3d 259; *People v Hayes*, 17 NY3d 46; *People v Vilardi*, 76 NY2d 67; *People v Santorelli*, 95 NY2d 412; *People v*

*Wright*, 86 NY2d 591; *People v Reedy*, 70 NY2d 826; *People v Doshi*, 93 NY2d 499; *United States v LeRoy*, 687 F2d 610.)

*Feldman & Feldman*, Uniondale (*Steven A. Feldman* and *Arza Feldman* of counsel), for respondent. The Second Department correctly ruled that Mark Garrett's CPL article 440 motion to set aside his conviction, on the ground that the People had failed to disclose *Brady* material, should have been granted. (*Brady v Maryland*, 373 US 83; *People v Fuentes*, 12 NY3d 259; *Daye v Attorney Gen. of State of N.Y.*, 696 F2d 186; *People v Bryce*, 88 NY2d 124; *Giglio v United States*, 405 US 150; *Strickler v Greene*, 527 US 263; *United States v Agurs*, 427 US 97; *Youngblood v West Virginia*, 547 US 867; *Milke v Ryan*, 711 F3d 998; *People v Benard*, 163 Misc 2d 176.)

*Kathleen M. Rice*, White Plains, *Steven A. Bender, William C. Milaccio, Richard Longworth Hecht, Maryanne Luciano* and *Tammy J. Smiley*, Mineola, for District Attorneys Association of the State of New York, amicus curiae. The Appellate Division improperly ordered a hearing despite defendant's clearly insufficient showing as a matter of law that a *Brady* violation occurred, and because of its erroneous ruling the Court inappropriately expanded and misapplied the *Brady* rule. (*People v Session*, 34 NY2d 254; *People v Brown*, 56 NY2d 242; *People v Baxley*, 84 NY2d 208; *People v Fuentes*, 12 NY3d 259; *Strickler v Greene*, 527 US 263; *People v Hunter*, 11 NY3d 1; *People v Vilardi*, 76 NY2d 67; *People v Wright*, 86 NY2d 591; *People v Miller*, 91 NY2d 372; *Milke v Ryan*, 711 F3d 998.)

**OPINION OF THE COURT**

Abdus-Salaam, J.

Defendant Mark Garrett was convicted after trial of two counts of murder in the second degree for killing a 13-year-old girl. The evidence against defendant included his confession, which he maintained was false and had been coerced by police. In this appeal, we are asked to determine whether the People committed a constitutional violation (*see Brady v Maryland*, 373 US 83 [1963]) when they did not disclose that a federal civil action had been brought against one of their police witnesses, a homicide detective who interrogated defendant, alleging that the detective engaged in police misconduct in an unrelated case. We hold that the People's failure to disclose this evidence did not constitute a *Brady* violation.

## I.

On July 18, 1998, Suffolk County police were called to investigate an overwhelming odor in a neighborhood in Wyandanch. The police discovered a dead body bundled up in sheets and dark colored plastic behind the fence of defendant's mother's home. Homicide detectives interviewed Frank Garrett, defendant's brother, and his girlfriend, J.C., who lived near defendant's mother. The detectives learned that J.C.'s 13-year-old daughter, L.C., had been missing for almost two weeks and that she was last seen leaving her home with defendant. Defendant, who was then on parole, had previously lived with his brother and J.C., and often visited his mother's home, but he had not been seen since L.C.'s disappearance. J.C. helped the detectives locate L.C.'s dental records, which were used to positively identify the dead body as L.C. on July 21st.

On July 23rd, detectives located defendant in an unoccupied residence in Coram, New York and arrested him pursuant to an outstanding parole warrant. They then transported defendant to the homicide bureau in Yaphank, where he was interrogated by several detectives, including Detective Vincent O'Leary. Although defendant initially denied any involvement in L.C.'s death, he eventually confessed orally and in writing that he had killed L.C. at his mother's home. In a signed sworn statement, defendant said that he had "wanted to have sex with [L.C.]," and when she refused, he grabbed her "tight around her chest and lift[ed] her up off the ground . . . a lot of times," at one point holding her in "a full nelson" by "squeezing her around the chest." L.C. went limp in defendant's arms, and when he could not revive her, he bound her body in electrical wire, wrapped it in sheets and garbage bags, and threw her over his mother's fence into an adjacent yard. After providing this statement, defendant drew a sketch of the crime scene and marked several crime scene photographs to depict, among other things, where he had deposited L.C.'s body.

Defendant was indicted on three counts of murder in the second degree (see Penal Law § 125.25). Prior to trial, defendant filed a demand for discovery, in which he generally requested that the People disclose all *Brady* material. He also moved to suppress his confession as false and involuntarily made. At a suppression hearing held in November 1999, the People presented testimony from Detective O'Leary and Detective Eugene Walsh. These witnesses testified, in essence, that after defendant was advised of and waived his *Miranda* rights, he voluntar-

ily confessed to the murder without being coerced to do so. Defendant offered a very different version of events: he testified at the hearing that the detectives never read him his *Miranda* rights and that they coerced him into signing a false confession by subjecting him to intense physical and psychological abuse. Defendant also presented the testimony of several witnesses, including two other homicide detectives who had interrogated him. While questioning Detective Samuel DeJesus, defense counsel asked the detective whether he or Detective O'Leary had been "involved in the James Halverson homicide case," which counsel explained "was a case involving a false confession." The suppression court sustained the prosecutor's objection to this line of questioning. After the hearing, the court denied defendant's suppression motion.

At trial, the People presented defendant's incriminating statements primarily through Detective O'Leary's testimony. The jury also considered circumstantial evidence implicating defendant in L.C.'s death, including testimony that the electrical wire and sheets found on L.C.'s body matched wire and sheets seized from defendant's mother's home, that L.C. was last seen alive leaving her home with defendant, and that, according to J.C., L.C. left with defendant to go to his mother's home. Detective O'Leary also testified that defendant's bedding and belongings were found in an interior, windowless hallway in the residence where he was arrested, indicating that he had been attempting to avoid detection. While cross-examining Detective O'Leary, defense counsel again referenced "the Halverson case," this time asking O'Leary if he worked on that case or was "familiar" with it. The prosecutor objected and defense counsel explained, at a sidebar, that O'Leary's involvement in the Halverson case was relevant because that case allegedly involved a false confession. The trial court sustained the objection and defense counsel did not pursue the inquiry further.

The jury returned a verdict convicting defendant of depraved indifference murder (*see* Penal Law § 125.25 [2]) and felony murder (*id.* at [3]), and in June 2000, he was sentenced to two concurrent indeterminate terms of 25 years to life in prison. The Appellate Division affirmed on direct appeal (*see People v Garrett*, 8 AD3d 676 [2d Dept 2004], *lv denied* 3 NY3d 674 [2004]). The court held, among other things, that the suppression hearing evidence established that defendant's incriminating statements were made voluntarily after he was advised of his *Miranda* rights, and that the trial evidence was legally suf-

ficient to establish defendant's guilt beyond a reasonable doubt (*see id.* at 676-677).

In December 2009, defendant, acting pro se, moved pursuant to CPL 440.10 to vacate his judgment of conviction. Defendant claimed that the People committed a *Brady* violation by failing to disclose to him that an unrelated civil action had been brought against Detective O'Leary and Suffolk County in United States District Court for the Eastern District of New York (hereinafter, EDNY) based on O'Leary's alleged police misconduct in an arson case. According to an EDNY docket printout submitted in support of defendant's motion, the civil complaint was filed on June 1, 1998, and was answered by O'Leary and Suffolk County via the Suffolk County Attorney on June 18, 1998, more than a month before defendant's arrest. The Federal District Court ordered the Suffolk County District Attorney's Office to unseal its files related to the civil case in January 2001, and the case was ultimately settled in March 2001, after defendant's trial and sentencing for murder had concluded.

The federal complaint alleged, in pertinent part, that O'Leary coerced the plaintiff, Keith Schroeter, into confessing to third-degree arson charges by repeatedly striking Schroeter in the head with a telephone book while he was handcuffed and physically forcing him to sign a written confession. Defendant asserted that, because Detective O'Leary was part of the prosecution's team, the People had constructive knowledge and a duty to learn of these allegations during the prosecution of defendant's case. Defendant further claimed that, had this information been properly disclosed, he would have used it to impeach O'Leary's credibility at the suppression hearing or at trial. In opposition to defendant's motion, the People submitted an attorney affirmation averring that they had no actual knowledge of the allegations against O'Leary until the District Attorney's Office was ordered to unseal its files in January 2001, after defendant had been convicted and sentenced. The People argued in the alternative that, even if they had been aware of the allegations, the information did not constitute *Brady* material.

County Court denied defendant's motion without a hearing. The court concluded that constructive knowledge of O'Leary's alleged bad acts in a different case could not be imputed to the prosecution, and because the People demonstrated they had no actual knowledge of the federal action until after defendant had been convicted and sentenced, no *Brady* violation had occurred.

A Justice of the Appellate Division granted defendant leave to appeal (2010 NY Slip Op 81496[U] [2010]), and that court reversed the County Court order and remitted the matter for a hearing (*People v Garrett*, 106 AD3d 929, 930 [2d Dept 2013]). The Appellate Division determined that the civil allegations against O'Leary "constituted impeachment evidence" and that the People's failure to disclose them "may have denied the defendant the opportunity to conduct an investigation leading to additional exculpatory or impeaching evidence" (*id.* at 931). The information was also material, according to the Appellate Division, because "the credibility of the detectives who obtained the defendant's confession was of central importance in [defendant's] case" and "other evidence tying him to the crime was weak" (*id.*). Contrary to County Court, the Appellate Division concluded that knowledge of the allegations could have been imputed to the People by "[someone] to whom the obligation under *Brady* extended, other than perhaps O'Leary himself" (*id.* at 932). Accordingly, the court remitted the matter for a hearing "to determine whether the District Attorney's office had sufficient knowledge of the suit against O'Leary so as to trigger its obligations under *Brady*" (*id.* at 931-932). A Judge of this Court granted defendant leave to appeal (*see* 21 NY3d 1042 [2013]) and we now reverse.[1]

## II.

*Brady* proscribes "the suppression by the prosecution of evidence favorable to [the] accused . . . where the evidence is material either to guilt or to punishment" (373 US at 87). "The *Brady* rule is based on the requirement of due process," and "[i]ts purpose is not to displace the adversary system as the primary means by which truth is uncovered," but to ensure that the accused receives a fair trial (*United States v Bagley*, 473 US 667, 675 [1985]; *see People v Bryce*, 88 NY2d 124, 129 [1996]). The People, in their role as truth-seekers in criminal trials, have a "broad obligation to disclose exculpatory evidence," but a mere breach of this duty does not offend the defendant's due process rights unless all the "components of a true *Brady* viola-

---

1. In moving for reargument before the Appellate Division, the People asserted, for the first time, that further investigation had revealed that the Detective O'Leary named in the federal lawsuit was not the same Detective O'Leary who questioned defendant. Because such information is dehors the record, we must assume for the purposes of resolving this appeal that the O'Leary in the federal litigation is the same detective who was involved in defendant's case.

tion" are established (*Strickler v Greene*, 527 US 263, 281 [1999]; *see also Bagley*, 473 US at 675 ["(U)nless the omission deprived the defendant of a fair trial, there was no constitutional violation . . . and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose"]). To make out a successful *Brady* claim, "a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (*People v Fuentes*, 12 NY3d 259, 263 [2009], citing *Strickler*, 527 US at 281-282; *see People v Hayes*, 17 NY3d 46, 50 [2011]; *People v LaValle*, 3 NY3d 88, 109-110 [2004]).

■ ■ In this case, the parties disagree as to all three essential *Brady* components. The People assert that the civil allegations against O'Leary were not favorable to defendant, suppressed by the prosecution, or material to defendant's guilt, while defendant maintains that the allegations meet each one of these elements. We conclude that, although the civil allegations were favorable to defendant, he has not proved that the People suppressed that information or that he was prejudiced by its nondisclosure.[2]

---

**2.** ■ As a preliminary matter, we note that, although County Court did not expressly state whether the contents of the civil complaint against Detective O'Leary were material for purposes of *Brady*, our decisions in *People v LaFontaine* (92 NY2d 470 [1998]) and *People v Concepcion* (17 NY3d 192 [2011]) do not bar us from deciding the materiality of that information. To be sure, *LaFontaine* and its progeny preclude our review of an entirely distinct alternative ground for affirmance which the court of first instance did not decide adversely to the appellant (*see Concepcion*, 17 NY3d at 196-197; *LaFontaine*, 92 NY2d at 472-474). However, for purposes of *LaFontaine*'s procedural bar, a court's finding that the prosecution did not constructively possess or suppress potential *Brady* information and a court's finding that the information is not material are not separate alternative grounds for decision, as neither finding is clearly separate and analytically distinct from the court's determination that the information does not satisfy the multipronged *Brady* standard. Thus, in this case, as in other cases involving a single multipronged legal ruling, *LaFontaine* does not prevent us from reviewing all preserved aspects of the *Brady* issue simply because the nisi prius court neglected to mention an element of the multifactor *Brady* test (*see generally People v Alfaro*, 19 NY3d 1075, 1076-1077 [2012] [upon review of the trial court's multipronged *Molineux* ruling, this Court affirmed the trial court's decision by adopting a different theory than the one accepted by the trial court with respect to one prong of the analysis, implicitly rejecting the dissent's contention that *LaFontaine* prohibited affirmance based on the reevaluation of that prong]; *see also id.* at 1079-1080 [Lippman, Ch. J., dissenting]).

## A.

"Evidence is favorable to the accused if it either tends to show that the accused is not guilty or if it impeaches a government witness" (*United States v Gil*, 297 F3d 93, 101 [2d Cir 2002], citing *Strickler*, 527 US at 281-282; *see also Fuentes*, 12 NY3d at 263). Impeachment evidence "falls within the *Brady* rule" because, when used effectively, it "may make the difference between conviction and acquittal" (*Bagley*, 473 US at 676; *see People v Baxley*, 84 NY2d 208, 213 [1994]). However, the "favorable tendency" of impeachment evidence should be assessed without regard to the "weight of the evidence" as a whole (*Kyles v Whitley*, 514 US 419, 451 [1995]; *see Walker v Kelly*, 589 F3d 127, 140 [4th Cir 2009]; *see also Lambert v Beard*, 537 Fed Appx 78, 86 [3d Cir 2013] [citing *Kyles* and stating that "the Supreme Court has made clear that impeachment evidence is 'favorable to the defense' even if the jury might not afford it significant weight"]). In other words, impeachment evidence may be considered favorable to defendant even if it is not material to the defendant's case.

Here, the civil allegations against O'Leary were favorable to defendant as impeachment evidence (*see Strickler*, 527 US at 281-282; *Kyles*, 514 US at 450-451). Defendant argued at the suppression hearing that O'Leary and other homicide detectives coerced him into making a false confession. The federal complaint made similar allegations against O'Leary: although it did not explicitly allege that the confession O'Leary procured was false, the complaint described coercive tactics O'Leary allegedly used to extract a confession against the plaintiff's will. This evidence clearly had an "impeachment *character*" that favored defendant's false confession theory, and we reach this conclusion without determining what, if any, *"effect"* the complaint may have had on the verdict in light of the evidence as a whole (*Walker*, 589 F3d at 140; *see Kyles*, 514 US at 451).

## B.

We consider now whether, under *Brady*'s second component, the People "suppressed" the favorable evidence, "either willfully or inadvertently" (*see Strickler*, 527 US at 282). Exculpatory or impeaching evidence is subject to *Brady* disclosure only if it is within the prosecution's custody, possession, or control (*see People v Santorelli*, 95 NY2d 412, 421 [2000]; *see People v Wright*, 86 NY2d 591, 596 [1995]; *see also Lavallee v Coplan*, 374 F3d 41, 43 [1st Cir 2004]). What constitutes "possession or

control" for *Brady* purposes "has not been interpreted narrowly" (*Santorelli*, 95 NY2d at 421), and it is beyond cavil that "the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession" (*United States v Risha*, 445 F3d 298, 303 [3d Cir 2006]; *see Kyles*, 514 US at 437-438; *Santorelli*, 95 NY2d at 421). Specifically, the duty "encompasses evidence 'known only to police investigators and not to the prosecutor'" (*Strickler*, 527 US at 280-281, quoting *Kyles*, 514 US at 438). As the Supreme Court explained in *Kyles*, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" (*Kyles*, 514 US at 437).

Applying *Kyles*, "this Court has charged the People with knowledge of exculpatory information in the possession of the local police, notwithstanding the trial prosecutor's own lack of knowledge" (*Santorelli*, 95 NY2d at 421; *see Wright*, 86 NY2d at 598). Similarly, we have observed, as have many federal courts, that the People may be in "constructive" possession of information known to government officials who "engaged in a joint or cooperative investigation" of the defendant's case (*Santorelli*, 95 NY2d at 421; *see e.g. United States v Paternina-Vergara*, 749 F2d 993, 997-998 [2d Cir 1984]). The rationale for the imputation of knowledge is that, when police and other government agents investigate or provide information with the goal of prosecuting a defendant, they act as "an arm of the prosecution," and the knowledge they gather may reasonably be imputed to the prosecutor under *Brady* (*see United States v Stewart*, 433 F3d 273, 298 [2d Cir 2006] [noting that "the propriety of imputing knowledge to the prosecution . . . does not turn on the *status* of the person with actual knowledge" but what that person *"did"* to aid the prosecution]; *e.g. United States v Morell*, 524 F2d 550, 555 [2d Cir 1975] [imputing law enforcement agent's knowledge of confidential file to prosecutors where agent supervised the witness, participated actively in the investigation and frequently sat at counsel table throughout the trial]).

However, there are limits to the extent exculpatory knowledge may fairly be imputed to the prosecution. Particularly relevant to this case, the First and Third Appellate Division departments have held that "[a] police officer's secret knowledge of his own prior illegal conduct in [an] unrelated case[ ] will not be imputed to the prosecution for *Brady* purposes where the People had no knowledge of the corrupt officer's 'bad acts' until after

. . . trial" (*People v Johnson*, 226 AD2d 828, 829 [3d Dept 1996]; *People v Vasquez*, 214 AD2d 93, 95 [1st Dept 1995], *lv denied* 88 NY2d 943 [1996]; *see e.g. People v Kinney*, 107 AD3d 563, 564 [1st Dept 2013]; *People v Longtin*, 245 AD2d 807, 810 [3d Dept 1997], *affd on other grounds* 92 NY2d 640 [1998], *cert denied* 526 US 1114 [1999]). In *Vasquez*, the First Department explained that a police officer is "not acting as an 'arm of the prosecution' " when he or she conceals his or her own criminal activity in a prior, unrelated case, and the People therefore have no duty to discover and disclose the officer's "collateral criminal conduct" under *Brady* (214 AD2d at 101). At least one federal appellate court has similarly "refused to extend *Brady*'s constructive knowledge doctrine" where the police misconduct was known only to the officer and was unrelated to the case at hand (*United States v Robinson*, 627 F3d 941, 952 [4th Cir 2010]).

The Appellate Division appears to have implicitly determined that O'Leary's knowledge of his own alleged misconduct and the civil action against him was not sufficient to trigger the People's duty to discover and disclose this evidence (*see* 106 AD3d at 932, citing *Vasquez*, 214 AD2d 93). Nonetheless, the court remitted defendant's case for a hearing to determine, essentially, whether anyone other than O'Leary "had knowledge of the civil action" that could have been imputed to the People (106 AD3d at 932). This was error.

A prosecutor's "duty to learn" of favorable evidence known to those "acting on the government's behalf" has generally been held to include information that directly relates to the prosecution or investigation of the defendant's case (*Kyles*, 514 US at 429, 437-440 [evidence pointing to a person other than defendant as potential killer and contradicting state's witnesses]; *see e.g. Youngblood v West Virginia*, 547 US 867, 868-870 [2006] [state trooper's knowledge of note written by women Youngblood allegedly sexually assaulted that was inconsistent with state's theory and consistent with defense of consent]; *Bagley*, 473 US at 670-672 [undisclosed contracts between main prosecution witnesses and federal agency agreeing to pay for information against Bagley]; *Wright*, 86 NY2d at 596 [victim's status as police informant establishing "motive for prosecution witnesses to corroborate" his version of events and "to disbelieve . . . (the) defendant"]). It follows that, when a police officer engages in illegal conduct in the course of his or her investigation or prosecution of the defendant, knowledge of that

misconduct may be imputed to the People for *Brady* purposes, regardless of the officer's motivation or the prosecutor's actual awareness (*see Freeman v State of Georgia*, 599 F2d 65, 69 [5th Cir 1979], *cert denied* 444 US 1013 [1980] [imputing to the prosecution investigating officer's concealment of the identity of an exculpatory witness]; *see also In re Siggers*, 615 F3d 477, 480 [6th Cir 2010] [holding that Siggers' allegations of "police misconduct and coercion resulting in the introduction of perjured testimony . . . would satisfy the second *Brady* require-ment"]; *compare People v Robertson*, 12 NY2d 355, 359-360 [1963] [misconduct by police witness who gave false testimony discrediting the defendant's involuntary confession defense "charged" to the prosecution even though they were unaware of the falsity and the false testimony was given unintention-ally]). But there is a distinction between the nondisclosure of police misconduct "which has some bearing on the case against the defendant," and the nondisclosure of such material which has "no relationship to the case against the defendant, except insofar as it would be used for impeachment purposes" (*Vasquez*, 214 AD2d at 100; *see Robinson*, 627 F3d at 952). In the latter circumstance, the offending officer is not acting as "an arm of the prosecution" when he or she commits the misconduct, and the agency principles underlying the imputed knowledge rule are not implicated (*see id.* at 101).

We need not "draw . . . hard and fast lines here about the scope of *Brady* imputation" (*Robinson*, 627 F3d at 952). We are satisfied that, under the circumstances of this case, the People had no constructive knowledge of the civil allegations against O'Leary. The allegations did not arise out of O'Leary's investiga-tion of defendant's case or his actions as part of the prosecution's team, nor were they directly related to defendant's murder pros-ecution. The federal lawsuit concerned O'Leary's alleged misconduct in an unrelated criminal case, and the allegations were, at most, collateral to defendant's prosecution to the extent they may have provided impeachment material. Accordingly, O'Leary's knowledge of his own alleged misconduct and the civil action against him could not be imputed to the People for *Brady* purposes.[3]

---

**3.** Contrary to the view taken by Chief Judge Lippman in his concurrence, our decision in *Wright* does not conflict with this holding. In *Wright*, we held that the People committed a *Brady* violation by "fail[ing] to inform the de-fendant that *the complainant* had previously operated as an informant for the

Defendant points out that, unlike *Vasquez* and other cases that concerned secret police misconduct, the civil allegations against O'Leary were contained in a "public federal lawsuit" filed before defendant was arrested. This is a distinction without a difference under the facts of this case, where the allegations against O'Leary could have been discovered only if the People had combed through the dockets of EDNY cases. Defendant asserts that this investigatory step is mandatory under *Brady*; specifically, he contends that the People were required to ask O'Leary whether he was being sued "in any court, for any reason related to his course of conduct as a Suffolk County Detective" and to "conduct[ ] a cursory check in state and federal court to see if the Detective had any civil rights cases against him."

We decline to construe the People's *Brady* obligations so broadly. "[I]t is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case" (*Robinson*, 627 F3d at 952). While prosecutors should not be discouraged from asking their police witnesses about potential misconduct, if they feel such a conversation would be prudent, they are not required to make this inquiry to fulfill their *Brady* obligations. Similarly, the People have no affirmative duty to search the dockets of every case in every federal and state court in New York for complaints against their police witnesses. A contrary rule, taken to its logical extreme, would require prosecutors to search for cases in every jurisdiction where investigating officers had a previous or existing connection "just in case some impeaching evidence may show up"

local police department" (86 NY2d at 593-594 [emphasis added]). We determined that this information was clearly "favorable" to the defendant because she could have used it to impeach police officers' testimony—which differed in critical respects from reports the officers prepared after the crime—by showing they had a "motive" to favor the complainant's version of events (*id.* at 596). The information also "would have provided the defense with an explanation for the decision by the police to disbelieve, and subsequently to arrest, [the] defendant" (*id.*). Accordingly, although "the witness in *Wright* was not acting as an informant in that case" (Lippman, Ch. J., concurring op at 897), the *information* in the police's possession—that the complainant had previously been a police informant—was directly related to the defendant's prosecution for assaulting the complainant and, therefore, knowledge of that information could be imputed to the People (*see* 86 NY2d at 598).

*(United States v Lee Vang Lor,* 706 F3d 1252, 1259-1260 [10th Cir 2013]; *see Risha,* 445 F3d at 304 ["'(P)rosecutors are not required to undertake a 'fishing expedition' in other jurisdictions to discover impeachment evidence"]). This would impose an unacceptable burden upon prosecutors that is likely not outweighed by the potential benefit defendants would enjoy from the information ultimately disclosed on account of the People's efforts.

Accordingly, defendant has not demonstrated that the People suppressed the civil allegations in violation of *Brady.* As County Court determined, the People have adequately proved that they had no actual knowledge of the allegations until after trial when their *Brady* obligations had ceased. We further hold that O'Leary's personal, pretrial knowledge of the allegations could not be imputed to the prosecutor, and that the prosecutor had no duty to inquire about the allegations or to search for the "public" lawsuit. Defendant has maintained throughout this litigation that O'Leary's knowledge of the allegations against him resulted in the imputation of that knowledge to the prosecutor; he has never alleged that the imputation derived from the knowledge of any other police officer or member of the prosecution team. Having concluded that the People had no actual or constructive knowledge of the allegations, we need not remit this matter for a hearing on suppression *(see* 106 AD3d at 932).

## C.

Even if we were to hold that the People suppressed the allegations against O'Leary, defendant's *Brady* claim would still fail because the nondisclosed evidence "does not meet the materiality standard—the third prong required to establish a *Brady* violation" *(Fuentes,* 12 NY3d at 265). "In New York, where a defendant makes a specific request for a document, the materiality element is established provided there exists a 'reasonable possibility' that it would have changed the result of the proceedings" *(id.* at 263, citing *People v Vilardi,* 76 NY2d 67, 77 [1990]). "Where, as here, the defense did not specifically request the information, the test of materiality is whether 'there is a reasonable probability that had it been disclosed to the defense, the result would have been different—i.e., a probability sufficient to undermine the court's confidence in the outcome of the trial' " *(People v Hunter,* 11 NY3d 1, 5 [2008], quoting *Bryce,* 88 NY2d at 128; *see Fuentes,* 12 NY3d at 263).

We agree with the People that there was no reasonable probability that disclosure of the civil allegations against O'Leary

would have changed the result of defendant's proceedings. Although defendant claims he could have used the allegations to impeach O'Leary's credibility at the suppression hearing or at trial, defendant previously tried and failed to admit similar impeachment evidence against O'Leary at both of these stages of the proceeding, and the courts sustained the prosecutor's objections to the evidence based on relevance grounds. Thus, it seems unlikely that defendant would have had any greater success in admitting the evidence at issue here, which was only marginally more relevant. This Court has not squarely addressed whether, as some federal courts have held, inadmissible evidence may be considered "material" under *Brady* so long as it "could lead to admissible evidence" (*Gil*, 297 F3d at 104; *see Hunter*, 11 NY3d at 5 [citing *Gil* but declining to decide whether, as the defendant argued, "information would be subject to *Brady* even if it was not itself admissible in evidence"]; *but see People v Scott*, 88 NY2d 888, 891 [1996] [no *Brady* violation because "polygrapher's opinions regarding the witness's veracity are not admissible evidence"]; *cf. People v Ennis*, 11 NY3d 403, 414-415 [2008] [holding attorney not ineffective for failing to preserve *Brady* claim "that had little or no chance of success" because "inadmissibility of the exculpatory information prevented it from being material"]). In any case, defendant has failed to show what, if any, admissible evidence disclosure of the allegations against O'Leary would have led to.

Finally, "in the context of this case, the value of the undisclosed information as admissible impeachment evidence would have been, at best, minimal" (*Fuentes*, 12 NY3d at 264). In addition to O'Leary, Detective Walsh testified at the suppression hearing about defendant's confession and the circumstances surrounding it. Since Walsh's testimony largely corroborated O'Leary's version of events, it is not reasonably probable that admission of the impeachment evidence would have resulted in the confession being suppressed. Moreover, the allegations concerned a collateral issue that was only tangentially relevant to defendant's prosecution. Defendant's confession was undoubtedly important to the People's case, but unlike the Appellate Division, we do not consider the circumstantial evidence connecting defendant to the killing so "weak" as to compel the conclusion that the allegations against O'Leary constitute *Brady* material.

Accordingly, the Appellate Division order should be reversed and the order of County Court reinstated.

Chief Judge LIPPMAN (concurring). I concur on the ground that the impeachment evidence at issue is not material under *Brady v Maryland* (373 US 83 [1963]). In light of that conclusion, there is no need to reach the question of whether the evidence was suppressed. However, since the majority resolves both of these prongs in the People's favor, I write separately to express my belief that Detective O'Leary's knowledge of the allegations pending against him in the federal lawsuit should be imputed to the People.

The majority's determination that the evidence was not suppressed relies on the so-called "unrelated criminal activity exception" to the imputation doctrine, which provides that a police officer's secret knowledge of his own misconduct in an unrelated case is not imputable to the People (*Campiti v Matesanz*, 186 F Supp 2d 29, 49 [D Mass 2002], *affd* 333 F3d 317 [1st Cir 2003], *cert denied* 540 US 931 [2003]; *see also e.g. People v Kinney*, 107 AD3d 563, 564 [1st Dept 2013]; *People v Seeber*, 94 AD3d 1335, 1336-1338 [3d Dept 2012]; *People v Ortega*, 40 AD3d 394, 395 [1st Dept 2007]; *People v Roberson*, 276 AD2d 446, 446 [1st Dept 2000]; *People v Johnson*, 226 AD2d 828, 828-829 [3d Dept 1996]; *People v Vasquez*, 214 AD2d 93 [1st Dept 1995]). The majority's interpretation of suppression under *Brady* is patently contrary to the Supreme Court's holding in *Kyles v Whitley* (514 US 419 [1995]) and subverts *Brady*'s fundamental concern with "insur[ing] that the accused receives a fair trial" (*People v Bryce*, 88 NY2d 124, 129 [1996]; *Strickler v Greene*, 527 US 263, 280-281 [1999]). At its core, the majority's suppression analysis relies on the problematic distinction "between the nondisclosure of police misconduct 'which has some bearing on the case against the defendant,' and the nondisclosure of such material which has 'no relationship to the case against the defendant, except insofar as it would be used for impeachment purposes' " (majority op at 889, quoting *Vasquez*, 214 AD2d at 100). According to the majority, "when a police officer engages in illegal conduct in the course of his or her investigation or prosecution of the defendant, knowledge of that misconduct may be imputed to the People for *Brady* purposes, regardless of the officer's motivation or the prosecutor's actual awareness" (majority op at 888-889). On the other hand, when the misconduct is "collateral" to defendant's case, the majority declares that the officer's private knowledge thereof is not subject to imputation (*see* majority op at 889).

This distinction is arbitrary and illogical in the context of *Brady*'s suppression prong. Ultimately, the majority's error lies

in conflating imputation and materiality. The tangential nature of impeachment evidence has no bearing on whether a police officer's knowledge thereof is attributable to the People. By contrast, the degree to which an officer's bad acts may be characterized as collateral to a particular case is certainly relevant to determining whether the evidence is material, that is, whether the failure to disclose it "undermines confidence in the outcome of the trial" (*Kyles*, 514 US at 434, quoting *United States v Bagley*, 473 US 667, 678 [1985]).

In support of its suppression analysis, the majority invokes agency principles underlying the imputation doctrine, reasoning that a police officer is not acting as an "arm of the prosecution" when he conceals his own wrongdoing in an unrelated case (*see* majority op at 887-888, 889). It is difficult to square this conclusory position with the majority's concession that an officer *is* considered a member of the prosecution team when he conceals ultra vires acts committed during the investigation or prosecution of the defendant (*see* majority op at 888-889). In both instances, it is the act of concealing evidence that constitutes the *Brady* violation. And in both instances, it is not the officer's "status" as a member of law enforcement, but his role in the investigation and prosecution of defendant's case that brings the concealment within the ambit of *Brady* (*cf. United States v Stewart*, 433 F3d 273, 298-299 [2d Cir 2006] [expert witness for the prosecution was not an "arm of the prosecution" when he provided false testimony because he "acted only in the capacity of an expert witness" and was not "in any way involved with the investigation or presentation of the case to the grand jury" or development of prosecutorial strategy]).

In other words, the majority's appeal to agency principles

> "misses the point of *Brady*. Perhaps the officer was not a state actor when he engaged in the underlying corrupt conduct, but he was a state actor when he testified against the defendant and concealed his misconduct from the defense. There can be no doubt that the officer knew that the evidence, which bears on his credibility, is favorable to the defense. If the evidence satisfies the standard of materiality, then his failure to disclose it violates *Brady*" (Robert Hochman, *Brady v Maryland and the Search for Truth in Criminal Trials*, 63 U Chi L Rev 1673, 1704 [1996]).

The majority's position ignores the police officer's independent obligation to disclose impeachment evidence and improperly

conveys to the police the discretion to make the judgment call on what misconduct qualifies as "collateral." This result presents precisely the sort of danger *Kyles* sought to avoid, namely, the unconstitutional substitution of "the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials" (*Kyles*, 514 US at 438).

Notably, while *Kyles* concerned suppressed evidence that related directly to the defendant's case, the Supreme Court said nothing to imply that the scope of imputable knowledge should be so limited. Rather, the Court simply held that *Brady* material includes information "known only to police investigators and not to the prosecut[ion]" (*Kyles*, 514 US at 438). Therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" (*id.* at 437). Contrary to the majority's position on the prosecutor's "duty to learn," courts addressing prior bad acts of police witnesses have interpreted *Kyles* more broadly.

For example, in *Arnold v McNeil* (622 F Supp 2d 1294 [MD Fla 2009], *affd on op below* 595 F3d 1324 [11th Cir 2010]), the District Court granted a petition for a writ of habeas corpus after determining that the collateral, illegal acts of the lead detective in a drug prosecution, which were unknown to the trial prosecutor, constituted *Brady* material. Citing *Kyles*, the court held that the detective's "knowledge of his own criminal conduct, constituting evidence that would be favorable to the defense, demonstrate[d] that the prosecution both 'possessed' favorable evidence . . . and 'suppressed' exculpatory or impeachment evidence" (*id.* at 1316). That the detective's misconduct in *Arnold* did not occur in the course of investigating the petitioner's case, or participating in its prosecution, was not dispositive of the suppression issue. Instead, the collateral nature of the detective's corrupt behavior affected the court's assessment of whether the evidence was material. Ultimately, the court concluded that

> "the illegal activities of [the detective] (many of which were strikingly close to the drug offense for which [the petitioner] was prosecuted), which were occurring at the precise time he was identifying [the petitioner] as the perpetrator and then testifying against him at trial, and [the detective's] failure to

disclose those activities to the prosecution so the prosecutor could disclose them to the defense, create[d] a reasonable probability that the outcome would have been different" (622 F Supp 2d at 1321 [internal quotation marks omitted]).

Moreover, the detective "was clearly a key member of the prosecution team whose information and testimony was vital to secure the conviction" (*id.* at 1315). On these facts, not only was the detective's private knowledge of his own unrelated, unlawful acts imputed to the People, but it was also material under *Brady*, and the court granted the petitioner habeas relief (*id.* at 1322).

Similarly, the federal court in *Campiti v Matesanz* (186 F Supp 2d at 49) suggested that restricting imputation to police knowledge of misconduct committed in the instant case is untenable after *Kyles*. Indeed, after noting that a number of courts had "absolved the prosecution of responsibility for failing to disclose the unknown, unrelated criminal activity of its corrupt officers" (*Campiti*, 186 F Supp 2d at 49, citing *United States v Rosner*, 516 F2d 269 [2d Cir 1975]; *Commonwealth v Waters*, 410 Mass 224, 229, 571 NE2d 399, 402 [1991]; *People v Vasquez*, 214 AD2d 93 [1st Dept 1995]; *People v Johnson*, 226 AD2d 828 [3d Dept 1996]), the *Campiti* court expressed doubt as to whether those cases remained good law (*see Campiti*, 186 F Supp 2d at 49 ["Since *Kyles* established the applicable rule, the Commonwealth is hard-pressed to argue that it lacked responsibility for [the officer's] failure to disclose his unlawful activity. The cases with similar factual circumstances cited by the Commonwealth were decided before *Kyles*, with the exception of *Johnson*, which did not cite or distinguish *Kyles*"]). Ultimately, the *Brady* claim in *Campiti* was rejected based on lack of materiality alone, and the court declined to reach the "knotty issue" of imputation (*id.*).

Applying *Kyles* in the manner proposed herein is also consistent with this Court's precedent regarding imputation in similar contexts. For instance, in *People v Wright* (86 NY2d 591 [1995]) the defendant argued that the prosecution's failure to turn over evidence that a prosecution witness had a "history as a police informant" constituted a *Brady* violation, warranting post-conviction relief (*id.* at 598). This Court agreed. We determined that the evidence "was both favorable and material to the defense" (*id.*). In addition, the fact that the witness' previous status was known only to police did not excuse the

prosecutor's failure to disclose it (*id.*, citing *Kyles*, 514 US at 437). Of particular relevance here is that the witness in *Wright* was not acting as an informant in that case (*see* 86 NY2d at 593-594). Therefore, the undisclosed information, like the federal civil rights allegations against O'Leary, constituted impeachment evidence arising from a prior case. But in *Wright*, we found that the People constructively possessed the information. Furthermore, we analyzed the value of the impeachment evidence, i.e., its relevance to the outcome at trial, under the materiality prong of *Brady*, concluding that under the circumstances, the collateral evidence was sufficiently material to warrant vacatur of the conviction (*id.* at 596-597; *see also Seeber*, 94 AD3d at 1338 [granting a motion to vacate pursuant to CPL 440.10 (1) (b) based on the misrepresentations of a State Police forensic scientist both in prior cases and the one sub judice; noting that "requiring a defendant to demonstrate that the People were aware of the subject misrepresentation in order to prevail . . . potentially sets the stage for a situation where a truly innocent person, whose conviction was obtained solely upon the basis of admittedly falsified, manufactured or otherwise unreliable evidence, might remain in prison simply because the People were unaware . . . of misfeasance on the part of a law enforcement representative"]).

In sum, the exception endorsed by the majority imposes limits on the imputation doctrine that are wholly inconsistent with *Kyles*. That decision stands for the proposition that favorable, material evidence known only to police officers involved in a criminal investigation is not exempt from *Brady*'s disclosure requirements. Members of the prosecution team, including the police investigators such as Detective O'Leary here, are subject to the same disclosure obligations; the knowledge of every member of the team is imputed to the prosecution. There is no rational basis for charging the People with a police officer's knowledge of his own misconduct in the defendant's case but not with wrongdoings perpetrated by the same officer in another context. Consideration of the collateral nature of an officer's prior bad acts is more properly undertaken at the materiality stage of the *Brady* analysis.

Frequently, the improper conduct will be tangential, or its impeachment value will be minimal in light of the strength of the other evidence of guilt, weighing in favor of a finding that its suppression was immaterial. Moreover, as here, lack of materiality will often obviate the need to reach the suppression

prong (*see e.g. Campiti*, 186 F Supp 2d at 49-50). But, in the event that both favorability and materiality tip in defendant's favor, the fact that the bad acts were perpetrated against a different suspect should not foreclose an otherwise meritorious *Brady* claim. The majority's flawed imputation analysis undermines the due process protections which the *Brady* doctrine enshrines.

In light of the above, it is unnecessary to address issues concerning the extent of the People's obligation to investigate the prior alleged misdeeds of police officers assigned to a particular case. Here, the detective's knowledge of the allegations lodged against him by a suspect in a different case was sufficient to trigger the disclosure obligation. Therefore, defendant satisfied the suppression prong of the *Brady* test.

SMITH, J. (concurring). We held in *People v LaFontaine* (92 NY2d 470 [1998]) and reaffirmed in *People v Concepcion* (17 NY3d 192 [2011]) that neither the Appellate Division nor our Court may consider, in a criminal appeal, issues that "were either decided in [the appellant's] favor or not ruled on" by the court of first instance (*LaFontaine*, 92 NY2d at 474). Here, County Court denied defendant's motion under CPL 440.10 solely on the ground that the prosecution had neither actual nor constructive knowledge of the allegations made in the federal complaint against Detective O'Leary. It did not consider the question of whether those allegations were "material" information—i.e. whether there was a reasonable probability that they would have changed the result of the case (*People v Fuentes*, 12 NY3d 259, 263 [2009]). The Appellate Division, however, did consider the materiality issue, and found the information material. One might think that this was obvious *LaFontaine* error, and that *LaFontaine* likewise bars this Court from deciding materiality.

But the majority holds that there is a distinction, for *LaFontaine* purposes, between "separate alternative grounds for decision" and mere prongs of a "single multipronged legal ruling" (majority op at 895 n 2). This distinction (not mentioned, as far as I know, in any previous discussion of *LaFontaine*) puzzles me. How is an appellate court to decide what is a separate alternative ground for decision and what is a prong? Why were not the alternative grounds for decision in *LaFontaine*—the existence of, and the necessity for, a valid and applicable warrant for the defendant's arrest—prongs of a ruling on the arrest's

validity? Why were not the two issues in *Concepcion*—the existence of consent to the search and the applicability of the inevitable discovery doctrine—prongs of a ruling on whether the Fourth Amendment required suppression of the evidence?

I do not know. But I am not complaining. As I explained in my dissent in *Concepcion*, the *LaFontaine* rule itself makes little sense to me, and if followed consistently (which it has not been) it will work enormous mischief. I thus welcome the majority's limitation of the rule—a limitation which perhaps amounts to an effective overruling of *LaFontaine*.

Judges GRAFFEO, READ and PIGOTT concur with Judge ABDUS-SALAAM; Chief Judge LIPPMAN concurs in result in an opinion in which Judges SMITH and RIVERA concur; Judge SMITH in a separate concurring opinion in which Judge PIGOTT concurs.

Order reversed and order of County Court, Suffolk County, reinstated.