OPINION OF THE COURT
Garcia, J.
Shortly after a fatal shooting took place, a law enforcement agent collected video surveillance footage of the crime scene but that evidence was lost prior to trial. We now consider whether, as a result, defendant was entitled to an adverse inference jury instruction. We hold that, under the circumstances, the trial court erred in failing to provide such an instruction, but that this error was harmless. For that reason, we affirm.
Defendant was charged with, among other things, intentional murder in the second degree and two counts of criminal possession of a weapon in the second degree in connection with a late-night shooting outside a Queens nightclub. Earlier on the evening of the shooting, defendant’s brother, Stephen, was struck by an unknown assailant outside of the club. When the club’s bouncer was unable to identify the assailant, Stephen called defendant and asked him to come to the club. According to the bouncer, a short time later defendant pulled up to the *530 front of the club in a dark colored Honda, got out, and immediately confronted him, demanding to know who hit his brother. Several people from inside the club surrounded defendant prompting him to drive off. As defendant drove away, however, he warned that he was “coming back.” Approximately 10 to 15 minutes later, someone near the club yelled “they’re back.” At that moment, the victim, the bouncer, and another witness, were standing by the front entrance of the club when an individual across the street fired nine shots in their direction. The 19-year-old victim, who was trying to get through the door into the club, was shot and died a short time later.
The club’s bouncer identified defendant in a photo array hours after the shooting and in a lineup following defendant’s arrest approximately two months later. He testified at trial that although he did not see the shooter’s face completely, he “could tell by what [the shooter] was wearing and the way he looked [that] it was the same person that was driving the [Honda].” However, he admitted on cross-examination that despite his prior identifications, he could not say for sure whether defendant was the shooter by looking at his face because he “didn’t see across the street.” The other witness, in identifying defendant, testified that he had a “good view” of defendant at the time of the shooting, could see where the bullets were coming from, and was able to observe defendant’s face. Although the witness did not know defendant, he knew defendant’s brother “from around the way,” and had seen him on two or three prior occasions.*
The People also called one of defendant’s childhood friends who had been arrested approximately two months after the shooting on an unrelated gun charge. Pursuant to a plea deal, the witness agreed to testify for the prosecution at defendant’s trial. According to his detailed testimony, the day after the shooting, defendant confessed that he and his brother were involved in an altercation at the club and that defendant had fired his weapon “in th[e] direction” of someone who was yelling at him.
Prior to trial, defendant timely requested disclosure of the club’s surveillance footage from the night of the murder and the District Attorney’s office requested the same from the po *531 lice department. The arresting officer, Detective Ragab, who just hours after the shooting viewed and obtained a copy of the video taken from a camera located outside the club’s front door, could not locate the video. Detective Ragab explained that he did not voucher the video pursuant to police department policy because he “just did not get to it.” Though he attempted to obtain another copy, the club had shut down and he could not locate the owner.
Several witnesses nevertheless provided some information about the lost video. One witness testified that the club had a “pretty good surveillance system” with a camera located by the awning above the door showing the front of the bar. Detective Ragab testified that he watched the video and could see people going in and out of the club during the course of the evening as well as people running inside at the time of the shooting. He claimed the area covered by the camera “barely leaves the sidewalk” but acknowledged that there was no way without the video to determine how far out the coverage extended. The bouncer — who had also watched the video — testified that the footage captured the victim, the other trial witness, and him at the front door as the shots were fired. He also testified that the camera did not face in the direction of the location where he saw defendant firing his weapon. There was no testimony regarding whether the earlier confrontations with the bouncer were captured on the surveillance footage.
At a pre-charge conference, defense counsel requested an adverse inference charge based on the missing video, arguing that there was evidence the video might have captured the events of the night and that without it, it was impossible to determine precisely what was on it, and that the jury should be informed that they could assume it was beneficial to defendant. The court denied the request for the charge, stating that it would only be appropriate if the evidence, had it been produced, would have been favorable to defendant. The court explained that the charge was not warranted because there was no testimony that the video would have shed light on the identity of the shooter. The jury convicted defendant of intentional murder and both gun possession counts.
The Appellate Division unanimously affirmed, holding that the lower court “properly declined to give an adverse inference charge” because “[t]here was no evidence that the video camera recorded anything relevant to the case, and the evidence suggested otherwise” (People v Viruet, 131 AD3d 714, 715 [2d Dept *532 2015]). A Judge of this Court granted leave to appeal (26 NY3d 1093 [2015]) and, for the reasons discussed below, we now affirm.
Defendant relies on our decision in People v Handy, pointing to our holding that “when a defendant in a criminal case, acting with due diligence, demands evidence that is reasonably likely to be of material importance, and that evidence has been destroyed by the State, the defendant is entitled to an adverse inference charge” (20 NY3d 663, 665 [2013]). In such circumstances, the charge is no longer “discretionary,” but is “mandatory upon request” (People v Blake, 24 NY3d 78, 82 [2014]). We agree that the rule in Handy applies here and that failure to give the instruction was error.
Initially, we reject the People’s argument that the video was not discoverable because they did not intend to use it at trial. Given that there is no indication that the prosecutors had the opportunity to view the video prior to their request to the police to locate it in the file, it is difficult to credit the argument that, without ever having seen it, they never intended to use it. Moreover, such a ruling would undermine the incentive for the State to preserve evidence, as it would provide the People with the opportunity to avoid issues of lost evidence by simply claiming they had no intent to use it (see Handy, 20 NY3d at 669). Likewise, we reject the People’s argument that they were not required to preserve the video because, unlike the prison video in Handy, it was created by a third party. Once the police collected the video, the People had an obligation to preserve it (see People v Kelly, 62 NY2d 516, 520 [1984]; CPL 240.20 [1] [g]).
Under these circumstances — where defendant acted with due diligence by requesting the evidence in discovery and the lost evidence was video footage of the murder defendant was charged with committing — it cannot be said that the evidence was not “reasonably likely to be of material importance” (Handy, 20 NY3d at 665). According to the trial testimony, the camera captured the moment when the victim was shot and the location of the two eyewitnesses at the time of the shooting. There was also testimony that the video contained footage of people going in and out of the club throughout the course of the night, making it at least possible that the video captured the earlier incident involving defendant and the bouncer — a key issue in the sequence of events. Contrary to the determination of the Appellate Division, a video of the shooting and of *533 the eyewitnesses at or around the time of the murder is certainly “relevant to the case” (Viruet, 131 AD3d at 715) and is sufficient to satisfy the standard set out in Handy. Moreover, as in Handy, testimony concerning what appeared on the video came in large part from a witness whose own actions “created the need to speculate about its contents” (Handy, 20 NY3d at 669). Accordingly, the trial court erred in failing to give an adverse inference instruction.
However, given the strength of the People’s case, the error was harmless. “Errors of law of nonconstitutional magnitude may be found harmless where ‘the proof of the defendant’s guilt, without reference to the error, is overwhelming’ and where there is no ‘significant probability . . . that the jury would have acquitted the defendant had it not been for the error’ ” (People v Byer, 21 NY3d 887, 889 [2013], quoting People v Crimmins, 36 NY2d 230, 241-242 [1975]).
In addition to the eyewitness accounts described above, the People presented testimony that defendant confessed to the shooting. That witness’s account was consistent with the version of the relevant events provided by the witnesses to the shooting. Additionally, the shooting occurred less than 20 minutes after an earlier altercation at the club ended with defendant threatening to return and immediately after someone nearby yelled “they’re back.” In light of this proof, such a permissive adverse inference instruction to the jurors that they might have but were not required to infer that the lost video would have been favorable to the defense would not have created a “significant probability . . . that the jury would have acquitted . . . defendant” ( Crimmins, 36 NY2d at 241-242).
Accordingly, the order of the Appellate Division should be affirmed.

 Nothing in the record equates, as the dissent contends, to a concession by the witnesses that “defendant and his brother could be mistaken for one another” (dissenting op at 537).