# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 55
The People &c.,
    Respondent,
   v.
Derrick Ulett,
    Appellant.

Leila Hull, for appellant.
Ruth E. Ross, for respondent.
The Bronx Defenders, et al., amici curiae.

GARCIA, J.:

Defendant Derrick Ulett was convicted of murder for shooting Ruben Alexandre

outside an apartment building in Brooklyn. The proof was substantial: several witnesses

placed defendant at the scene, with two identifying him as the shooter. We hold, however,

- 1 -

that the People violated their constitutional obligation to disclose a surveillance video that captured the scene at the time of the shooting, including images of the victim and a key prosecution witness. Failure to produce this video raises a reasonable probability that its disclosure would have produced a different result at trial. Accordingly, we reverse the order of the Appellate Division.

I.

The prosecution is required to disclose information that is both favorable to the defense and material to either defendant's guilt or punishment (see Brady v Maryland, 373 US 83, 87 [1963]; People v Vilardi, 76 NY2d 67, 73 [1990]). That duty to disclose encompasses impeachment evidence as well as exculpatory evidence (see Strickler v Greene, 527 US 263, 280 [1999]; Giglio v United States, 405 US 150, 154-155 [1972]). "The rule applies regardless of the good or bad faith of the prosecutor, for its purpose is not to punish misconduct but to insure that the accused receives a fair trial" (People v Bryce, 88 NY2d 124, 129 [1996]). To establish a Brady violation warranting a new trial, "the defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Hayes, 17 NY3d 46, 50 [2011]; see also Strickler, 527 US at 281-282). With this well-established standard in mind, we examine the People's proof, the relevance of the missing evidence, and the potential effect of suppression on the outcome of the trial.

II.

In March 2008, the victim was shot and killed in front of 48 St. Paul's Place. Defendant was arrested more than one year later. At his trial, the People presented a series of eyewitnesses: two witnesses identified defendant as the shooter and one placed him at the scene at the time of the murder. Defense counsel extensively cross-examined the witnesses, concerning, among other things, motive to fabricate testimony, opportunity to observe the relevant events, and inconsistencies with other witness accounts.

A bystander walking down St. Paul's Place witnessed the shooting and thereafter identified defendant as the shooter. On cross-examination, this witness conceded that she had only a brief glimpse of the side of the shooter's face. She testified that she did not see anyone else at the scene at the time of the shooting.

A second witness testified that, shortly before the shooting, he saw three men, including the victim, standing outside 48 St. Paul's Place. Later, as the witness stood on an adjacent street corner, he saw defendant, whom he had known for more than 20 years, walking toward him before turning left onto St. Paul's Place. He heard gunshots less than a minute later. The witness saw defendant cross the street and walk back toward him holding something in his waistband. To corroborate this testimony, the People introduced surveillance video from defendant's apartment building, which showed an individual generally matching the witness's description of defendant leave the building minutes before the shooting and return soon thereafter. On cross-examination, the witness testified that he saw the same two individuals with the victim both before and after he was shot—

testimony that contradicted that given by a third witness, Rashawn Cream, and the bystander.

Cream, a childhood friend of both the victim and defendant, was present when the shooting occurred and was the key witness at trial. At the time of the murder, Cream had pending robbery and narcotics charges from a 2007 arrest. He fled the scene without speaking to the police. Ten months later he came forward with his version of events in an effort to obtain favorable treatment on the unrelated criminal charges. After his statement to police but prior to trial in this case, Cream was given a plea deal to reduced charges, although he testified at defendant's trial that there was no agreement to reduce the sentence in exchange for his cooperation. With respect to the murder, Cream stated that he and the victim were outside 48 St. Paul's Place when defendant came around the corner and began arguing with the victim before pulling out a gun and shooting him. According to Cream, defendant ran back up St. Paul's Place and around the corner, consistent with other witness testimony. Cream testified that he was alone with the victim and denied being with anyone else both before and immediately after the shooting. Defense counsel extensively cross-examined Cream about who he was with both before and after the murder; defendant's actions at time of the shooting, including the direction in which he fled from the scene; and Cream's actions after the shots were fired.

In summation, defense counsel emphasized that there was no video evidence to establish what happened in front of 48 St. Paul's Place at the time of the shooting.

Referencing testimony that the building had surveillance cameras in the lobby, defense counsel pointed out that no video from those cameras had been introduced:

> "Where is that video surveillance? Wouldn't you think, ladies and gentlemen, that if there was video camera surveillance at 48 St. Paul's Place, that would be very important, that possibly could show what it was that took place; don't you think it would have shown who actually shot [the victim]? We don't have that video."

The prosecutor responded:

> "[Y]ou heard from [defense counsel] that there are video cameras inside 48 St. Paul's Place; inside the lobby, okay. Common sense, ladies and gentlemen, you saw that the police recovered video footage from [defendant's apartment building], . . . which is around the corner in the direction of flight that the defendant went. Isn't it common sense that they went to the building where the actual event took place in front of? And isn't it common sense that you would have seen that video if there had been a video?"

In fact, there was a video from a surveillance camera in the lobby and the prosecutor had reviewed it before the trial. Nevertheless, it was only years after the verdict—pursuant to a Freedom of Information Law request—that the District Attorney's Office sent defense counsel a copy. The camera recording the video was fixed to the ceiling in the back corner of the lobby at an angle that captures people entering and exiting the lobby, as well as a partial view of the activity in front of the building. On the day of the shooting, the camera recorded what appear to be images of Cream, the victim, and a third individual interacting out front shortly before the shooting. Another individual, who appears to be a delivery person, is seen securing a bicycle outside just as the victim is seen falling to the ground on the sidewalk in front of the entrance. The delivery person then goes into the vestibule and

turns to face the street as yet another individual enters the frame, hovers over the prostrate victim, and extends an arm toward the victim before exiting to the right of the frame. A person, presumably Cream, then runs inside the building behind the delivery person.

After receiving the video, defendant moved to vacate his conviction pursuant to CPL 440.10, arguing that the evidence was both material and favorable to the defense and therefore the People's failure to disclose it violated their obligations under Brady v Maryland (373 US at 87). Moreover, defendant argued that the prosecutor's statement to the jury that no video existed compounded the Brady violation and deprived defendant of his right to a fair trial. In response, the People conceded that the prosecutor had seen the video prior to trial but argued that it was not Brady material because the image quality was so poor that it rendered the video useless to the defense. Further, the People maintained that the prosecutor's misstatement in summation did not rise to the level of misconduct warranting a new trial.

Defendant's trial counsel and the prosecutor testified at the hearing on the postconviction motion. Copies of the surveillance video at original and reduced speed, as well as stills from the video found in the prosecutor's file, were introduced at the hearing. Trial counsel for defendant testified that she would have used the video (1) to impeach Cream's testimony; (2) to support a defense that a third party was the shooter; and (3) to identify other potential witnesses. The prosecutor testified that although she had watched the video after presenting the case to the grand jury, she believed it did not constitute Brady material because it did not capture the shooter and the images were too "washed-out" to

identify anyone. The prosecutor put the video in a box for "irrelevant" evidence and "forgot about it."

The court denied defendant's motion, concluding that defendant's alternative shooter theories were "highly speculative" and "not supported by a reasonable viewing of the surveillance tape." The court similarly dismissed defense counsel's claim that the video would have led to an additional eyewitness, noting that it would have been "fruitless" to attempt to locate the person who appeared to be making a delivery. As to the video's impeachment value, the court found that defendant "present[ed] a much stronger argument." The court concluded, however, that even assuming the video would have been useful at least for impeachment purposes, there was no reasonable probability that disclosure would have changed the result of the proceeding. Nor was the prosecutor's misstatement regarding the existence of the surveillance video so egregious as to warrant reversal.

In a consolidated appeal, the Appellate Division unanimously affirmed defendant's judgment of conviction and the order denying his motion to vacate the judgment (153 AD3d 945, 945 [2d Dept 2017]). That Court also assumed, as did the hearing court, that the video was favorable evidence withheld by the People but found that "defendant failed to show a reasonable probability that the result would have been different had the video been disclosed . . . , particularly in light of the very limited view provided in the video of the events occurring outside the building" (id.). The court noted that "any impeachment value provided by the video was minimal, as was the likelihood that the video would have

led to additional exculpatory or impeaching evidence" (id.).  As to the allegation of prosecutorial misconduct, the Appellate Division held that "although some remarks were improper, they were not so flagrant or pervasive as to deprive the defendant of a fair trial" (id.).  A Judge of this Court granted leave to appeal (31 NY3d 1018 [2018]).

III.

Defendant argues that failure to disclose the video was a Brady violation warranting reversal and that the prosecutor's denial in summation that the video existed compounded the prejudice of that violation and deprived him of a fair trial.  In response, the People challenge only satisfaction of the third prong of the Brady test—whether the suppressed evidence was material.

In New York, where the defense "did not specifically request the information, the test of materiality is whether 'there is a reasonable *probability* that had it been disclosed to the defense, the result would have been different'" (People v Garrett, 23 NY3d 878, 891 [2014], quoting People v Hunter, 11 NY3d 1, 5 [2008] [emphasis supplied]).[*]  Defendant concedes that the "reasonable probability" standard applies here.  In determining materiality, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair

---

[*] Under New York law, where a defendant makes a specific discovery request, "the materiality element is established provided there exists a reasonable *possibility* that it would have changed the result of the proceedings" (Garrett, 23 NY3d at 891 [emphasis supplied], citing Vilardi, 76 NY2d at 77).  In contrast, in federal court reasonable *probability* is the materiality standard for all alleged Brady violations (see Kyles v Whitley, 514 US 419, 434 [1995]; United States v Bagley, 473 US 667, 682 [1985]).

trial, understood as a trial resulting in a verdict worthy of confidence" (Kyles, 514 US at 434, quoting Bagley, 473 US at 678).  The "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict" (Kyles, 514 US at 434-435).  Defendant need only show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" (id. at 435).

Practically, this standard requires us to evaluate the quality of the People's proof against the suppressed evidence—a process described as "legally simple but factually complex" (Turner v United States, 137 S Ct 1885, 1893 [2017]).  The factual analysis is made less complex by the nature of the favorable evidence withheld here, namely, a video that captured the scene at the time of the murder.  That video would have changed the tenor of the trial, placing the People's case in such a different light as to undermine confidence in the verdict.

As described above, the People's case relied principally on witness testimony as there was no forensic evidence linking defendant to the murder (see Banks v Dretke, 540 US 668, 701 [2004] [finding relevant to the materiality analysis the fact that there was no forensic or physical evidence tying defendant to the crime]).  Against this proof, we must measure the cumulative effect of the suppressed evidence (see Kyles, 514 US at 421).  Here, the People withheld a video of the crime scene that captured events surrounding the murder, including the body of the victim as he fell to the ground.  That video was relevant to a number of issues at trial (see People v Viruet, 29 NY3d 527, 532-533 [2017] [missing

surveillance video that captured the shooting and identified potential eyewitnesses was "reasonably likely to be of material importance" in the context of an adverse inference jury instruction]).

This video evidence could have been used to impeach the eyewitnesses. Each was cross-examined on testimony concerning, among other things, his or her movements at the crime scene, the presence of others before and after the shooting, and the direction of the assailant's flight. Images on the tape were relevant to those areas of inquiry. For example, the tape clearly contradicted Cream's statement that he was alone with the victim shortly before and after the shooting. We reject the People's argument that the impeachment value of the video is cumulative to what was already available to defense counsel. Impeachment with contradictory testimony of other witnesses is hardly the same as being confronted with a videotape of the scene.

The video would also have provided leads for additional admissible evidence (see United States v Mahaffy, 693 F3d 113, 131 [2d Cir 2012]; United States v Gil, 297 F3d 93, 104 [2d Cir 2002]) and avenues for alternative theories for the defense. The video shows people entering and exiting the building, including other potential eyewitnesses. At a minimum, the presence of unidentified witnesses, at least one of whom was only a few feet away when the shots were fired, could have been used by the defense to argue that the police failed to conduct a thorough investigation (see Kyles, 514 US at 446-447 [finding that undisclosed Brady material could have been used to attack "the thoroughness and even the good faith of the investigation"]). And the video captures something none of the

eyewitnesses reported: an additional person at the scene interacting with the victim as he lay on the ground, which defense counsel could have used at trial in combination with the medical examiner's report to argue that another shooter was potentially responsible for the victim's death after he fell to the ground.

Further, the prosecutor's statements in summation, which denied the existence of a video, "compounded the prejudice to the defendant" (People v Cwikla, 46 NY2d 434, 442 [1979]).  These remarks characterized defense counsel's summation as a desperate attempt to distract the jury from the proof by reference to phantom evidence—when in fact the surveillance video did exist, it had been withheld, and it would have been useful to defendant's case.

It requires no frame-by-frame review to grasp that the video would have become the focal point of defendant's trial.  It would have set the scene of the murder, identified other potential witnesses, served to impeach eyewitness testimony, and provided a basis for an argument that other suspects might have been involved in the shooting.  Instead of playing that role at trial, the video was withheld from the defense and the jury was told it did not exist.  The aggregate effect of the suppression of this evidence undermines confidence in the verdict and therefore defendant is entitled to a new trial.

Accordingly, the order of the Appellate Division should be reversed, defendant's motion pursuant to CPL 440.10 to vacate defendant's judgment of conviction and sentence granted and a new trial ordered.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order reversed, defendant's motion pursuant to CPL 440.10 to vacate defendant's judgment of conviction and sentence granted and a new trial ordered. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Wilson and Feinman concur.

Decided June 25, 2019

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*