[7 NYS3d 52]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMEEK STILLEY, Appellant.

First Department, March 31, 2015

APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Eunice C. Lee* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Ellen Stanfield Friedman* of counsel), for respondent.

## OPINION OF THE COURT

RICHTER, J.

Defendant stands convicted of felony murder, robbery and weapon possession arising from a May 20, 2006 shootout that resulted in the death of an innocent bystander. The principal evidence at trial consisted of both a written and videotaped confession by defendant. In those confessions, defendant stated that on the day of the incident, he and two of his friends, Kwame Edwards and Dana Booth, traveled to upper Manhattan to rob a drug dealer, Andres Santana. Defendant and his friends, all of whom were carrying guns, approached Santana and told him they wanted to purchase marijuana. Shortly after, defendant and Booth met up with Santana in the lobby of a nearby building, where Santana handed the marijuana to defendant. Booth pretended he was taking money out of his wallet, but Santana realized Booth did not have any money, and signaled to one of his cohorts. Defendant pulled his gun on Santana, said, "[A]ll I want is the weed," and instructed Santana to go to the back of the building.

In the confessions, defendant further stated that he went outside and saw Edwards with his gun drawn. Santana then reappeared and threatened to call the police. Edwards fired off a shot and defendant and his friends fled. Defendant looked back and saw one of Santana's cohorts reach for a gun at his waist. Defendant warned Edwards, and Edwards spun around and fired another shot. Defendant heard a woman scream as if she was hurt, and shot three times in the air, at an angle. The woman was hit by one of the bullets fired that afternoon and subsequently died. Defendant and his friends fled to a nearby subway station, went to Edwards's house in Brooklyn and divided up the marijuana. The police began their investigation into the shooting and arrested Edwards and Booth soon thereafter. Defendant learned that the police were looking for him, and he fled upstate to Utica. He was subsequently apprehended and brought back to New York, where he made his two confessions.

At trial, Santana was called as a witness by the People and gave testimony consistent with defendant's confessions. In the direct examination, the trial prosecutor elicited that Santana used to sell marijuana and had 9 to 10 prior arrests, but had never been convicted of a crime. On cross-examination, defense counsel asked Santana if he continued selling drugs after the May 20, 2006 incident for which defendant was on trial. Santana replied that he stopped dealing drugs and had turned his life around, and that the day of the incident was the last time he had ever sold drugs.

The jury returned its verdict on November 13, 2007, and sentencing was adjourned several times at the People's request. On the February 22, 2008 adjourned date, the trial prosecutor told the court that the People were still not ready to proceed to sentencing and asked to explain the reasons ex parte.[1] During that ex parte proceeding, the trial prosecutor disclosed that two days after the verdict, he retrieved a voice mail from another prosecutor (the investigating prosecutor) stating that Santana had sold drugs to an undercover officer. The trial prosecutor told the court that "there was a voice mail message for me from [the investigating prosecutor] asking me, saying, hey, when is [Santana] going to testify, because one of my officers bought from him over the weekend." The trial prosecutor further explained that the investigating prosecutor subsequently "looked into it and she determined that the first buy they made from him was the day he testified [November 5, 2007], the evening of the day he testified."

In this same ex parte proceeding, the trial prosecutor explained that Santana was still being investigated, and that the police were trying to purchase A-1 weight drugs and guns from him. The trial prosecutor told the court that although he believed the information should be disclosed to the defense, he wanted to wait until the investigation was completed to protect its integrity. The court expressed concern over how long the investigation would last and scheduled a future date, February 28, 2008, for a supervising prosecutor to provide further information. The proceedings resumed in open court and the court adjourned the sentencing. No disclosure was made at that time.

On February 28, 2008, the trial prosecutor and the supervising prosecutor appeared ex parte before the court. The court

---

1. Defendant was aware there would be an ex parte colloquy but did not object.

asked both prosecutors about when the District Attorney's Office first learned that Santana had sold drugs on the evening he testified at defendant's trial. The trial prosecutor assured the court that he did not learn of it until after the verdict. The supervising prosecutor replied that, at that moment, he could not state with certainty when either his office or the police learned that the individual who had made the drug sale was Santana, but offered to return to court to provide that information. Although the court again stressed the importance of learning "when somebody found out that [Santana] had testified falsely about his drug dealing," the court did not instruct the People to return to court with that critical information, nor did it order immediate disclosure to the defense.

In a criminal court complaint dated March 27, 2008, Santana was charged with 10 separate drug sales, including cocaine, ecstasy and marijuana. Two of the alleged ecstasy sales took place on November 8 and 11, 2007, which was after Santana testified but before the verdict was rendered. On April 9, 2008, the trial prosecutor disclosed to defense counsel that Santana had sold marijuana on the night he testified, and was the subject of a long-term narcotics investigation. The following week, the court unsealed the two ex parte proceedings. On April 18, 2008, defendant moved pursuant to CPL 330.30 to set aside the verdict, arguing that the People's withholding of Santana's drug sales deprived him of a fair trial. The court denied the motion and ultimately sentenced defendant, and this appeal ensued.

On appeal, defendant's principal claim is that the People violated their obligations under *Brady v Maryland* (373 US 83 [1963]) and its progeny. It is well established that a defendant has the right, under both the State and Federal Constitutions, to discover favorable evidence in the People's possession that is material to guilt or punishment (*Brady v Maryland*, 373 US at 87; *People v Fuentes*, 12 NY3d 259, 263 [2009]). Furthermore, the People's *Brady* obligations apply to both exculpatory and impeachment evidence (*see Giglio v United States*, 405 US 150, 154 [1972]). Such evidence, however, "is subject to *Brady* disclosure only if it is within the prosecution's custody, possession, or control" (*People v Garrett*, 23 NY3d 878, 886 [2014]). "To establish a *Brady* violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the

suppressed evidence was material" (*People v Fuentes*, 12 NY3d at 263).

◼ Defendant contends that the People violated their *Brady* and *Giglio* obligations by failing to disclose, before the end of the trial, that Santana had sold drugs after he testified. There is no question, and the People do not argue otherwise, that Santana's drug sales constitute impeachment material subject to disclosure under *Brady* and *Giglio*. Santana's sale of drugs is not only criminal conduct relevant to his general credibility, but also is evidence that Santana lied during his trial testimony when he claimed that he had turned his life around and stopped selling drugs.

◼ Nevertheless, defendant has failed to establish that a *Brady* violation occurred because there is no conclusive showing, on the limited record here, that the information about Santana's drug dealing was in the People's custody, possession or control before the trial ended. In the ex parte proceedings, the trial prosecutor told the court that he only learned of Santana's drug activity two days after the verdict, and there is no definitive proof that the investigating prosecutor, or anyone else in the District Attorney's Office, knew of Santana's drug dealing before the verdict. Although Santana's drug sales to the undercover officer occurred during the trial, there is no indication in the record whether the police learned, prior to the verdict, that the individual who made the sales was, in fact, Santana.

Because almost all of the record here was made ex parte and little detail was provided to the court, many unanswered questions remain. Most importantly—did anyone in the District Attorney's Office have knowledge, prior to the verdict, that Santana had sold drugs on the very day he testified in this case? It is undisputed that the investigating prosecutor knew who Santana was before the trial because Santana had surfaced during an earlier unrelated search warrant overseen by the investigating prosecutor.[2] Likewise, it is clear from the ex parte proceedings that the investigating prosecutor was aware that Santana was a witness in defendant's trial. Indeed, according to the trial prosecutor, the investigating prosecutor's voice mail asked

---

2. Before Santana testified, defense counsel inquired about the execution of a search warrant involving Santana. The trial prosecutor told the court that the search warrant was connected to an unrelated investigation conducted by the investigating prosecutor, and that the investigating prosecutor had spoken with Santana.

when Santana would be testifying. Further, a fair inference can be made that the investigating prosecutor was involved at some point in the operation that led to Santana's arrest because in her voice mail, she stated that "one of *my* officers bought from [Santana]" (emphasis added). However, the record before us is insufficient to definitively resolve the critical question of when the investigating prosecutor, or the police, knew of Santana's resumed drug dealing, and when they learned his identity. Because no CPL 440.10 motion to expand the record was made, the myriad questions presented here cannot be resolved on this appeal.

Likewise, the record does not adequately resolve questions about the significant delay between the trial prosecutor's discovery of Santana's drug sales and his disclosure of that fact to the court and defense counsel. The trial prosecutor acknowledged that he learned of Santana's drug dealing on November 15, 2007, two days after the verdict was rendered. Yet, he did not inform the court of this discovery until February 22, 2008, more than three months later, and then waited an additional six weeks before telling defense counsel. Although the People contend the delay was due to the desire not to compromise an ongoing investigation, the record developed here is sparse, and it is unclear why some limited disclosure to defense counsel could not have been made sooner. Of course, the interest in protecting the investigation would not excuse the nondisclosure if the People knew of Santana's drug sales during the trial.

Even when the disclosure to the court was made, the People could not provide the exact date the District Attorney's Office learned of Santana's resumed drug dealing. Although the court asked that very question at the first ex parte proceeding, no one from the prosecutor's office could provide that information at the next ex parte colloquy, nearly a full week later. And when the supervising prosecutor offered to return to court to provide more detail, the court did not follow up. If the People or the court had made a more complete record, or if the record had been developed with defense counsel present, we might have been able to ascertain what actually happened. Nevertheless, despite these unanswered questions, any post-verdict delay in disclosure caused no prejudice to defendant, who had a full opportunity to litigate the *Brady* issue before sentencing.

■ Despite our concerns, we nevertheless conclude that the judgment of conviction should be affirmed. It is axiomatic that there can be no *Brady* violation unless the suppressed informa-

tion is "material" (*People v Fuentes*, 12 NY3d at 263). Where, as here, a defendant has made a specific request for the undisclosed information, "the materiality element is established provided there exists a reasonable possibility that it would have changed the result of the proceedings" (*id.* [internal quotation marks omitted]). Under this standard, even if the information about Santana's recent drug sales had been disclosed before the end of trial, there is no reasonable possibility that the verdict would have been different.

Even if we assume that the jury would have discounted Santana's testimony entirely had the additional drug sales been revealed, the proof against defendant was overwhelming. Defendant admitted, in two confessions, all of the facts necessary to establish his guilt beyond a reasonable doubt of felony murder, robbery and weapon possession (*see People v Dishaw*, 30 AD3d 689, 691 [3d Dept 2006], *lv denied* 7 NY3d 787 [2006] [no reasonable possibility of a different verdict particularly in light of the defendant's oral and written confessions]). In those confessions, defendant stated that, on the day of the incident, he traveled with his two friends to upper Manhattan to rob Santana. Defendant described the incident in detail, admitting that he pulled a gun on Santana while he and his cohorts robbed him of marijuana. Defendant also admitted that he and Edwards fired shots as they fled, and that he heard a woman scream. Defendant further explained that he traveled to Brooklyn and divided up the marijuana, and that when he learned the police were looking for him, he fled upstate to Utica.

Defendant's confessions were corroborated by other evidence at trial. Surveillance cameras from nearby businesses captured defendant and his accomplices running from the scene immediately after the incident. Defendant's girlfriend testified that before the incident, defendant told her that he was going uptown to rob a marijuana location. After the shooting, defendant told his girlfriend that he had committed the robbery, that Edwards fired a gun at a drug dealer that was chasing them, that defendant heard a woman scream, and that defendant himself shot three times in the air. Defendant's consciousness of guilt was shown by the fact that immediately after the shooting, he asked his girlfriend to take the braids out of his hair. Edwards's girlfriend testified that after the incident, defendant and his cohorts talked about engaging in a "shoot out in broad daylight." And while in Utica, defendant told another woman

that he was "on the run" from a robbery that had gone "bad" where "a lady died." In sum, the overwhelming evidence at trial eliminates any reasonable possibility that the verdict would have been different had the jury disregarded Santana's testimony.

■ The court properly denied defendant's motion to suppress his statements. There is no basis for disturbing the court's credibility determinations, including its finding that one of the testifying detectives had a better and more reliable recollection of the facts than that of the other detective. The record establishes that defendant did not make any statements until after the administration of *Miranda* warnings. Before the warnings, the detectives made introductory remarks about the evidence in the case, but directed defendant not to say anything at that point, an instruction defendant followed.

We perceive no basis for reducing the sentence, which was much closer to the minimum than the maximum.

Accordingly, the judgment of the Supreme Court, New York County (Rena K. Uviller, J.), rendered July 24, 2008, convicting defendant, after a jury trial, of murder in the second degree, robbery in the first degree (two counts), robbery in the second degree and criminal possession of a weapon in the second and third degrees, and sentencing him to an aggregate term of 18 years to life, and the judgment of resentence, same court (Michael A. Corriero, J.), rendered December 6, 2007, resentencing defendant to a concurrent term of 1⅓ to 4 years for a violation of probation, should be affirmed.

Sweeny, J.P., Andrias, Moskowitz and Clark, JJ., concur.

Judgment, Supreme Court, New York County, rendered July 24, 2008, and judgment of resentence, same court, rendered December 6, 2007, affirmed.