People v McGhee (2019 NY Slip Op 09116)





People v McGhee


2019 NY Slip Op 09116


Decided on December 19, 2019


Appellate Division, First Department


Mazzarelli, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 19, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr., J.P.
Peter Tom
Angela M. Mazzarelli
Jeffrey K. Oing
Anil C. Singh, JJ.


6041/11 

[*1]The People of the State of New York, Respondent,
v
Darrin McGhee, Defendant-Appellant.



Defendant appeals from the order of the Supreme Court, New York County (Laura A. Ward, J.), entered on or about April 23, 2018, which denied defendant's CPL 440.10 motion to vacate the judgment, same court and Justice, rendered July 7, 2015, convicting him, after a jury trial, of murder in the second degree and criminal possession of a weapon in the second degree, and imposing sentence, and from the foregoing judgment.



Robert S. Dean, Center for Appellate Litigation, New York (Ben A. Schatz of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (David P. Stromes and Patrick J. Hynes of counsel), for respondent.



MAZZARELLI, J.


" The Brady rule is based on the requirement of due process, and [i]ts purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that the accused receives a fair trial'" (People v Garrett, 23 NY3d 878, 884 [2014], quoting United States v Bagley, 473 US 667, 675 [1985]). Here, the People admittedly failed to disclose a witness statement that could have aided the defense in attempting to impeach the only eyewitness to the shooting in question and that could have opened up an additional avenue of investigation. Indeed, the Court of Appeals recently reaffirmed that a defendant's inability to interview a potentially favorable witness because his existence was suppressed constitutes a [*2]Brady violation where the information gathered, "if true, would have directly contradicted the People's theory of the case" (People v Rong He, 34 NY3d 956, 958 [2019]). Moreover, here, in addition to the Brady violation, there were at least two other trial errors. While each of those errors may have individually withstood analysis under the harmless error doctrine, of overriding concern in appellate review of any jury verdict is whether the defendant received a trial that was fundamentally fair. Coupled with the People's failure to turn over the statement, it cannot be said in light of those errors that the goal of a fair trial was achieved. Accordingly, defendant is entitled to vacatur of his conviction pursuant to CPL 440.10 and a new trial.
Defendant was charged with murder in the second degree and criminal possession of a weapon in the second degree in connection with the November 14, 2011 shooting death of Archie Phillips in the parking lot of the Polo Grounds public housing complex. The principal item of evidence presented by the People was the eyewitness and identification testimony of Nicole Davis, who lived in the Polo Grounds. According to her testimony, a few minutes after 3:30 p.m. on the day of the shooting, Davis walked out of her building to socialize with friends near the parking lot next to a staircase that led up to the street (known locally as the "110-step staircase"). Davis saw Phillips standing 50 to 60 feet away, talking to and hugging a woman. Roughly one minute later, Davis saw defendant, wearing "all beige" clothes, a jacket, and a flat cap with a snap in front, walk up to Phillips, shoot him in the back four times, and then walk slowly to the 110-step staircase. Defendant looked Davis in the eye after he shot Phillips, and she recognized him as someone she had seen twice before. The first time was four or five months earlier, the prior summer, in the same parking lot. At that time, he was new to the neighborhood, and she and another friend watched him for about an hour while he was in the parking lot. The second time she saw him was one week before the shooting. Davis was walking out of her building as defendant was walking in, and Davis held the door for him. They exchanged greetings. Davis was "sure" that the man who shot Phillips was the same man she had seen on those two occasions.
Prior to trial, defendant had moved to suppress Davis's identification of him. Davis picked defendant out of a photo array several hours after the shooting and out of a lineup several weeks later. At a Wade hearing, Detective Jorge Morban testified that, before Davis viewed the photo array, he showed her a 40- to 50-minute surveillance video that did not show the shooting but that did depict various people in the vicinity of the Polo Grounds around the time of the shooting. Morban testified that he told Davis to view the video, and that during the viewing "[s]he basically yells out, that's him, that's him. He shot the boy in the Polo Ground." She also revealed that she had seen defendant twice before, once four or five months earlier, the prior summer, in the same parking lot, and a second time a week before the shooting, when she was walking out of her building and defendant was walking in. In response to questioning from the court, Morban admitted that as Davis was viewing the video he instructed her to let him know if she saw anyone wearing all brown, since the police were aware from 911 calls that the perpetrator had been dressed in brown. About 21 hours later, Morban showed Davis a six-person photo array. Morban asked if she recognized anyone, and Davis identified one of the photos, which was of defendant, as showing the shooter. About 1 1/2 months later, Davis viewed a six-person lineup. Morban told Davis that the suspect from the Polo Grounds shooting might or might not be in the lineup, and if she recognized him "from the photo array" or "[f]rom the shooting," she should state his number and from where she recognized him. Davis identified defendant as the person who did the shooting. The court denied the suppression motion. In addition, it admitted Davis's statement,"[t]hat's him," at trial as an excited utterance.
The People presented other witnesses (although not eyewitnesses) in addition to Davis, including John Reynolds, who testified pursuant to a cooperation agreement. Reynolds stated that, on the evening of November 11, 2011, Phillips assaulted him and stole his money, including [*3]drug sale proceeds, and his iPod and watch. Reynolds told Mike Lilly, a drug dealer he worked for, about the incident, and Lilly told him that Phillips had recently robbed another of Lilly's drug sellers, and that he was going to "send a clear message" to Phillips, and that Phillips was "out of here." Over the next several days, a period during which Reynolds was smoking marijuana "excessively," Lilly arranged for defendant to kill Phillips, and directed Reynolds to give defendant a gun and a cell phone that he could use to contact Lilly the next time he saw Phillips. Phone records introduced at trial confirmed that defendant had the phone beginning on November 13, 2011, because beginning on that date, the phone made and received calls from four numbers that defendant repeatedly called during later periods of incarceration at Rikers Island. Cell site and cell phone records showed that defendant used the phone from near the Polo Grounds during the afternoon on November 13, 2011.
On the day of the shooting, Lilly called Reynolds to tell him that he was coming over to get Reynolds's gun. Reynolds was not home, but he called his wife and told her to let Lilly into the apartment. That afternoon, while Reynolds was alone in the apartment, Lilly used his cell phone to call Reynolds at 3:23 p.m., 3:24 p.m., and 3:27 p.m., and told Reynolds that he was on the 155th Street Bridge, which overlooked the Polo Grounds, having spotted Phillips. At 3:28 p.m., Lilly called the phone that Reynolds's wife had given to defendant. Defendant answered, and the call lasted just under a minute. Cell phone records showed that both phones were in or near the Polo Grounds. At that time, Reynolds looked out of his window, which faced the 155th Street Bridge and the 110-step staircase, and he recognized defendant walking down the steps. He did not observe the shooting, but did see defendant run back up the stairs.
Reynolds further testified that he took a cab to Lilly's apartment after the shooting. Lilly told Reynolds, "[T]hat boy [is] out of here. He's gone." Defendant said, "You should have seen how I put five in [him]." Reynolds saw that Lilly had smashed the shells left in the gun, which was lying nearby. Defendant said they should scrape the inside of the barrel with a coat hanger "to get off the ballistics." Lilly later broke the gun and got rid of it. Reynolds learned that Lilly had paid defendant in crack cocaine and money to shoot Phillips. At a later time, Reynolds saw Lilly pay defendant "his last little bit of money." The People also elicited the testimony of Reynolds's wife, who was in the apartment the day after Reynolds was assaulted when he, Lilly and defendant were there. She testified that Reynolds went to retrieve a gun and the three men then spent time looking out a window for somebody. The next day the wife gave a cell phone she had to defendant, at her husband's direction. The following day, she testified, she was in the apartment when Reynolds called and instructed her to let Lilly into the apartment. She did, and she saw Lilly go into the bedroom, retrieve a gun and exit the apartment.
After defendant was apprehended, he made several recorded phone calls in which he acknowledged that he was on surveillance videos. Those surveillance videos, from two buildings on St. Nicholas Place between West 153rd Street and West 155th Street from around the time of the shooting, showed that, at approximately 3:42 p.m., defendant and Lilly walked along St. Nicholas Place, away from the 110-step staircase. Lilly walked in the street, with his right arm out, as if trying to hail a taxi. Defendant walked behind Lilly in the street, and then waited near the sidewalk, behind a car. The men were gesturing and seemed to be agitated or excited. They walked toward 153rd Street, and defendant kept a jacket over one hand, near his waist. Eventually, defendant caught up with Lilly, and both men ran across the street. At around 3:40 p.m., Morban and a police officer arrived in response to radio calls of gunshots fired in the Polo Grounds. Phillips was placed in an ambulance, but he died on the way to the hospital. Morban spoke to people on the street and learned the shooter was "a male Black in brown."
Several months after the trial concluded, the assistant district attorney who tried the case received an inter-office email attaching a report from a detective who had interviewed an eyewitness to the [*4]shooting. The ADA and another prosecutor had themselves interviewed the witness before the trial, having learned that a man who had been arrested for a drug sale near the Polo Grounds told a detective that he had seen the Philips shooting. The prosecutors spoke to the eyewitness in the detective's presence, and no one took notes. Both prosecutors recalled only that the witness said he saw a man in brown clothes go down the 110 step-staircase, shoot Phillips, and go back up the steps. The ADA concluded that the statement was "cumulative" and did not disclose it to the defense. However, after receiving the email, he notified defendant's trial counsel about the witness, and attached the report, which he stated he had not known had ever been created. The report stated:
"We asked [the eyewitness] about Archie Phillips who was killed in the Polo Grounds. This met the following results: On this day he was sitting 155 st by the train station with [redacted] and [redacted] both who are originally from the Polo Grounds. When he's hanging out, he's very observant of his surrounding area. During this time he observes a m/b wearing a beige bucket hat, darker beige shirt and khakis walking down the 110 steps. The m/b walks through the 3rd lane of the parking lot to the F/O building #3 and engages in a conversation, with a m/b (later known as Archie Phillips). At this time, he hears 1 gun shot and sees Archie being chased by the m/b (dressed in beige) running towards building #2. He loses sight of them, when they run behind the benches and then sees them again. Once he sees them again, he hears 3 more shots and sees the perp, run back towards the 110 stairs by cutting through the 1st lane of the parking lot and run's [sic] up the 110 stairs.
"The word on the street is that Archie robs' people after they cash their S.S. check. The killer is the son of one of his robbery victims.
"ADA Hammer, ADA Gilbert and ADA Krupnick did interview the [redacted] in regards to the above statement.
"Det Morban of the 32sqd was notified of the above statement.
"All perps in this case have been arrested and have a court appearance in part 71 on 3/04/13."
Defendant's appellate counsel met with the ADA and the eyewitness at the District Attorney's office. The witness refused to provide his full name, and his recollection of the shooting differed from his earlier statement. Among other things, he stated that the shooter did not chase Phillips, and he no longer recalled whether there was a conversation before the shooting. The witness also claimed that he did not know who had said that the shooter was the son of one of Phillips's robbery victims. According to the prosecution, when appellate counsel asked the witness to describe the man in beige who shot Phillips, the witness's description matched defendant's height and build.
Defendant moved pursuant to CPL 440.10 to vacate the judgment of conviction on the ground that it was obtained in violation of his state and federal constitutional rights, including his rights under Brady. Defendant noted that the prosecution failed to disclose that it had interviewed a second eyewitness two years before trial and failed to disclose the report. Defendant's trial lawyer submitted an affirmation in which he explained how timely disclosure of the information would have affected his preparation of the defense, including a misidentification defense. His investigator also submitted an affidavit in which he stated that timely disclosure would have been valuable because the statement contained "several strong leads." For example, he would have spoken to the eyewitness before his memory faded or he became uncooperative, and he would have located the other two people who were sitting with the eyewitness. In [*5]addition, the rumor that Phillips robbed Social Security recipients was another lead that would have caused the investigator to seek out people not otherwise on the defense "radar" for potential leads about Phillips or those who wanted to kill him. The court denied the motion, on the basis that there was "overwhelming evidence" supporting the verdict, so that disclosure of the statement would not have resulted in a different verdict. We conclude that this was error.
The Brady rule, derived from the Due Process Clauses of the Federal and state Constitutions, requires the prosecution to disclose evidence in its possession that is favorable and material to the defense (see Brady v Maryland, 373 US 83 [1963]; People v Giuca, 33 NY3d 462, 473 [2019]; People v Fuentes, 12 NY3d 259 [2009]). To establish a Brady violation, the defendant must show that (1) the evidence is favorable to the defendant because it is exculpatory or impeaching in nature, (2) the evidence was suppressed by the prosecution, willfully or inadvertently, and (3) prejudice resulted to the defendant because the suppressed evidence was "material" (Strickler v Greene, 527 US 263, 281-282 [1999]; People v Garrett, 23 NY3d 878, 884 [2014]; Fuentes, 12 NY3d at 260). Here, the People concede the first two prongs, as they must, since the witness statement could have been used to impeach Davis and because it was suppressed. The question then becomes whether it was material.
The test for materiality in this case is relaxed, because defendant specifically requested witness statements. Accordingly, all defendant needed to establish was that there exists a "reasonable possibility" (not probability) that the verdict would have been different had the material not been suppressed (see People v Vilardi, 76 NY2d 67, 77 [1990]). In the recently decided case of People v Rong He (34 NY3d 956 [2019], supra), the People failed to turn over to the defendant, who had been charged with assaulting someone in a nightclub, the statement by the owner of the nightclub, which identified two people as assailants, neither of whom was the defendant. The Court held that the statement was material because, notwithstanding other evidence of the defendant's guilt, the sole witness to identify the defendant at trial initially told police he did not see the assailant's face. Thus, granting the defendant access to the owner "could have allowed defendant to develop additional facts, which in turn could have aided him in establishing additional or alternative theories to support his defense" (id. at 959).
The People attempt to minimize the impeachment potential of the witness statement, acknowledging certain discrepancies between the description of the perpetrator contained therein and that given by Davis of defendant, but arguing that they are insignificant. For example, they point out, there is not a substantial difference between Davis's description of the assailant wearing a flat cap with a brim snap and the witness's description of a "bucket hat." Nor, they argue, is it significant that one witness saw the shooter speak to the victim and one did not; that one observed four successive shots and the other witnessed one shot and then three more while the victim was being chased; whether the shooter ran or walked away from the scene; or, finally, whether the assailant was wearing a jacket or not.
These differences are not insubstantial under the circumstances. As in Rong He, there was only one eyewitness who testified at trial, Davis, making her credibility "a pivotal consideration" (People v Steadman, 82 NY2d 1, 8 [1993] [finding Brady materiality where prosecution suppressed promise that sole eyewitness would not receive prison time for pending charges against him in exchange for testimony]). Similarly, in People v Bond (95 NY2d 840 [2000]), the Court found that a material Brady violation existed where the prosecution failed to divulge a prior inconsistent statement by an admitted crack addict who actually witnessed the shooting in question, holding that "while defendant was able to challenge [the witness]'s credibility based on her drug usage, he was denied the opportunity to challenge the credibility of the People's key witness as a liar" (95 NY2d at 843]). At trial, defendant had little basis for questioning Davis's identification of him as the shooter. Accordingly, any ability to challenge her description of the assailant would have been critical to the defense in at least being able to [*6]plant a seed of doubt in the jury's mind. Further, given certain other infirmities in the People's evidence, such as the fact that Reynolds was testifying under a cooperation agreement and admitted to using copious amounts of marijuana around the time of the incident, it is impossible to say that even a semblance of skepticism about Davis's identification of defendant would not have tipped the jury into the realm of reasonable doubt.
The People also argue that the fact that the undisclosed witness's statement noted that the victim was known to people in the neighborhood as one who would rob people for their Social Security checks, and that he had robbed the father of the person who killed him, is too speculative to form the basis for a material Brady violation. However, because it suggested an alternative theory about who killed Phillips, its materiality is clear. In the recent Court of Appeals decision People v Ulett (33 NY3d 512 [2019]), the People secured a murder conviction based principally on eyewitness testimony. Unbeknownst to defense counsel until after the trial, a surveillance video placed in a position that captured the precise scene where the victim was shot existed, but had not been produced. Applying the more stringent "reasonable probability" test employed when Brady material is not requested by the defense before trial, the Court reversed the conviction. It found that the video, which showed a person interacting with the victim after he was shot, could have opened an additional avenue of inquiry for the defendant, since none of the people who testified mentioned the presence of that person. The Court of Appeals did not require that the defendant establish any degree of probability that such an inquiry would have borne fruit. Similarly, in People v Rong He (34 NY3d 956), the Court required the People to produce the statement of witnesses who recalled a second assailant without expressing any concern about whether, once interviewed, those witnesses would be able to identify a person whom the defendant could point to as the true perpetrator. Finally, it is highly relevant here that the Ulett Court observed that, "[a]t a minimum, the presence of unidentified witnesses, at least one of whom was only a few feet away when the shots were fired, could have been used by the defense to argue that the police failed to conduct a thorough investigation" (33 NY3d at 521).
The dissent cites several cases that it asserts "draw borders around the materiality aspect of the Brady analysis." It does this to demonstrate that, where there is overwhelming evidence of guilt, or the alleged Brady material is weak, a defendant will usually fail to overcome the materiality test. However, in one of those cases, Turner v United States (__US__, 137 S Ct 1885 [2017]), the United States Supreme Court stated that analyzing the materiality element
"is legally simple but factually complex. We must examine the trial record, [and] evaluate the withheld evidence in the context of the entire record" (__ US at __, 137 S Ct at 1893 [internal quotation marks omitted]).
Thus, in light of the fact-intensive nature of Brady objections, comparing one case to others, for the purposes the dissent offers, is not particularly constructive. Indeed, and in any event, the cases cited by the dissent differ sufficiently on their facts that they do not support the dissent's position that the undisclosed witness statement here was not material. For example, unlike in Turner and People v Giuca (33 NY3d 462 [2019], supra), the impeachment value of the statement was not cumulative of other material defendant used at trial to impugn Davis's credibility. To the contrary, there was no such material. In People v Stilley (128 AD3d 88 [1st Dept 2015] lv denied 27 NY3d 1007 [2016], the defendant confessed twice to the homicide at issue. There is no such confession here. In People v Hart (43 AD3d 722 [1st Dept 2007], lv denied 9 NY3d 1006 [2007]), the victim and an additional eyewitness both testified. Here, again, there was only one eyewitness who testified at trial. And in People v Brooks (123 AD3d 448 [1st Dept 2014]), lv denied 25 NY2d 1070 [2015]), the alleged Brady material was the police report of a person who did not witness the homicide, in contrast to the statement here, which identified [*7]a person who did.
The dissent concludes that there was no reasonable possibility that the disclosure to the defense of the witness statement would have changed the outcome of the trial, by permitting defendant to impeach Davis or to inquire into whether there was any factual basis for the rumor about people other than defendant having a motive to murder Phillips. However, it does so in a conclusory fashion, without addressing any of the infirmities in the People's case discussed above. To the extent that the dissent rests its conclusion on the witness's having disavowed some of the content of his original statement at a joint interview with defendant's appellate counsel and the People's trial attorney, it is noted that the joint interview took place nearly four years after the original statement was given. Thus, it is impossible to say whether the passage of time altered the witness's memory or motivation to give an accurate account, and whether knowledge of his existence much closer to the time he gave the initial statement would have borne fruit for defendant.
Even if one were to agree with the dissent that the materiality prong of the Brady test was not met, the prosecution's failure to produce the witness statement should not be considered in isolation from the trial errors to which defendant objected. These included the admission of Davis's identification of defendant on surveillance video, which was tainted by Morban's suggestion that she look for someone in all brown, the color the alleged assailant was wearing according to the 911 calls (see generally People v Edmonson, 75 NY2d 672, 676-677 [1990], cert denied sum nom Edmonson v New York, 498 US 1001 [1990]). Additionally, the court erred in admitting as an excited utterance Davis's statement to Morban, "[T]hat's him, that's him. He shot the boy in the Polo Ground," when she saw defendant in the video, since she was not in the requisite state of mind (see People v Johnson, 129 AD3d 486 [1st Dept 2015], lv denied 26 NY3d 1089 [2015]); People v Mitchell, 46 AD3d 480 [1st Dept 2007], lv denied 10 NY3d 842 [2008]).
We do not suggest that these errors were, standing alone, not harmless. However, they are compounded by the suppression of the witness report, and "[u]ltimately, sufficient harmless errors must be deemed harmful'" (People v Dowdell, 88 AD2d 239, 248 [1st Dept 1982). In other words, given multiple errors, each of which would otherwise be considered harmless, "the cumulative effect [may be] to deny the defendant the fair trial to which he was entitled, . . . constrain[ing a court] to reverse and remand for a new trial without regard to any evaluation as to whether the errors contributed to the defendant's conviction'" (People v Nevedo, 202 AD2d 183, 186 [1st Dept 1994], quoting People v Crimmins, 36 NY2d 230, 238 [1975]). We recognize that there is significant evidence in the record that can be reasonably construed to suggest defendant's guilt. However, as the Crimmins Court stated, "[T]he right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (36 NY2d at 238). Here, the trial errors, coupled with the prosecution's failure to turn over the witness statement, raise a serious question as to whether defendant was deprived of that right.
Accordingly, the order of the Supreme Court, New York County (Laura A. Ward, J.), entered on or about April 23, 2018, which denied defendant's CPL 440.10 motion to vacate the judgment, same court and Justice. rendered July 7, 2015, convicting him, after a jury trial, of murder in the second degree and criminal possession of a weapon in the second degree, and sentencing him, as a persistent violent felony offender, to an aggregate term of 25 years to life, should be reversed, on the law, the motion granted, and the matter remanded for a new trial. The appeal from the judgment, same court and Justice, should be dismissed, as academic.
All concur except Tom, J.
who dissents in an Opinion.




TOM, J. (dissenting)


Because I conclude that defendant was not deprived of a fair trial as a consequence of the prosecutor's inadvertent failure to timely disclose the existence of a witness who did not testify at trial, I respectfully dissent. I differ with the majority principally on the issue whether the undisclosed evidence in this case was material with respect to the conviction, which necessarily raises the question whether disclosure would have reasonably led to a different verdict. In examining materiality, we are responsible for considering the trial record as a whole.
The facts indisputably show, by overwhelming evidence, that defendant was hired as a contract killer by Michael Lilly, a local drug dealer, to execute the victim, Archie Phillips, who had apparently robbed one of Lilly's employees, John Reynolds, whom defendant later shot and killed. Reynolds, who provided the gun for the killing and otherwise provided essential services leading to the killing, entered a cooperation agreement and testified against defendant in exchange for a reduced sentence. Reynolds's wife, who was uninvolved but witnessed the interactions and activities of the culpable participants in material respects, volunteered identifications to the police and provided compelling trial evidence. Nicole Davis, who was in the parking lot where the killing took place, witnessed the shooting in broad daylight. She identified defendant, whom she recognized from prior observation in the neighborhood and a recent encounter in her apartment building, in a surveillance tape as well as a photo array and a lineup. Video surveillance cameras in various locations, as well as evidence derived from a cell phone, placed defendant at various locations at times relevant to the shooting and his flight, and in the company of Lilly. This surveillance and cell phone evidence also fatally undermined defendant's own testimony while also providing persuasive corroboration of the People's theory of the case.
The majority focuses on the existence of another potential witness whom the prosecutor, concluding that his evidence was merely cumulative, did not call at trial. However, a detective had recorded the undisclosed witness's statements during an investigative interview, which ultimately resulted in a report. The report reflected that the undisclosed witness stated that he had seen the killer talk to the victim and chase him, in contrast to Davis's testimony that defendant approached the victim and quickly shot him four times before himself running away. The undisclosed witness also related that he had heard a street rumor that the victim may have been shot by a relative of someone robbed by the victim. However, he described the shooter as wearing beige or khaki clothing, which was consistent with the testimony of Davis and other witnesses.
The prosecutor seemingly overlooked the potential witness so that his existence was not disclosed to defendant at the time of trial. Several months after the trial, he received the report of the detective who had initially interviewed the witness. The prosecutor informed defense counsel. Defendant's attorney and the prosecutor then interviewed the witness, whose statements differed in some significant details from his original statements in the police report.
Defendant moved to vacate the conviction pursuant to CPL 440.10 on the basis of Brady v Maryland (373 US 83 [1963]) and other grounds. In denying the motion, Supreme Court, examining the report, found that the testimony could have served for impeachment but that it was not itself material and it would not likely have altered the outcome of the verdict. In view of the overwhelming evidence, where several items of evidence interlocked with and corroborated other evidence of guilt, I reach the same conclusion.
In Turner v United States (_US_, 137 S Ct 1885 [2017]), the United States Supreme Court recently analyzed the issue of materiality for a Brady claim where the potential impeachment information had not been disclosed to the defense at the time of trial. In what the Court described as a fact-intensive case, two participants in the group robbery and murder of the victim cooperated with the prosecution. These witnesses testified as to the defendants' planning and then perpetrating the vicious assault as they robbed the victim, who ultimately died of her [*8]injuries. This testimony was amply corroborated by additional testimony by witnesses who had heard and observed the group proposing a robbery or who had observed the assault by perpetrators recognized by the witnesses. During postconviction proceedings, however, additional, previously undisclosed, evidence was turned over to the defendants. This included the prosecutor's or police notes of an interview of an undisclosed witness whom the prosecutor concluded was not credible (and eventually was murdered by the person whom she initially identified as the killer), an interview of another potential witness who stated that she had been high on PCP at the time of the crime, and two more undisclosed sets of notes of interviewees who provided information at variance with that of other witnesses. This also included a statement that a man had been seen running from the scene, which defendant construed to support a single-perpetrator theory at variance with the group robbery/assault theory presented by the prosecutor's evidence. The defendants argued that had they known of the undisclosed information, they could have argued alternative theories, including that of a single assailant, ostensibly exonerating the appealing defendants and undermining the prosecution's case.
However, considering the record as a whole, the Supreme Court characterized the withheld evidence was "too little, too weak, or too distant from the main evidentiary points to meet Brady's standards" (id. at 1894). The Court noted that the witnesses might have "differed on minor details, but virtually every witness to the crime itself agreed as to [the] main theme" (id.). The Court concluded that it was not "reasonably probable that adding [the undisclosed identity and statements] could have led to a different result at trial" (id.). To the extent the undisclosed information had impeachment value, the record showed it to be largely cumulative and insufficient to undermine confidence in the jury's verdict (id. at 1895).
This approach by the Supreme Court, I conclude, has salience for the present case, notwithstanding the majority's concern that the impeachment related to Davis, the only prosecution eyewitness to the shooting itself. Although New York employs a less demanding standard - no reasonable possibility rather than no reasonable probability (People v McCray, 23 NY3d 193, 198 [2014]) - I conclude that these facts do not support vacating the conviction and remanding for a new trial.
In People v Giuca (33 NY3d 462 [2019]), the defendant was convicted with Antonio Russo of murder in the second degree and additional offenses on the basis of testimony by several acquaintances that the defendant supplied Russo with the gun with which the victim was killed, had made incriminating statements after the murder, and hired another individual to dispose of the gun two days later, coupled with phone records consisting of an unusual number of calls between the defendants in the hours before and days after the murder. Thus far, the factual similarity with the present case is striking. Additional incriminating testimony was provided by a jailhouse informant whose extensive criminal record and history of drug abuse was elicited during cross-examination. In his subsequent CPL 440 motion, the defendant claimed that the People had failed to disclose an agreement to confer a benefit on the jailhouse informant in exchange for the testimony, which the defendant further inferred was related to a different prosecutor's personal intervention to seek a favorable result for the informant in an unrelated drug case notwithstanding his failure to comply with a court-imposed condition involving drug treatment. The Court found no sound support for the existence of a cooperation agreement in the murder case, and that even if information pertaining to the informant's lack of success in a rehabilitation program had been disclosed, its value for impeachment purposes would have been cumulative. Defense counsel had amply availed himself of opportunities to impeach the witness on cross-examination and challenged his credibility on summation on the basis of the informant's own admissions, the evidence of the defendant's guilt from other sources was overwhelming, and the additional information presented no reasonable likelihood of a different verdict. This analytical approach, if applied here, would also compel an affirmance.
In a trio of murder cases of relatively recent vintage, we have also rejected Brady challenges on the basis of the quantum of the evidence supporting conviction. In People v Stilley (128 AD3d 88 [1st Dept 2015], lv denied 27 NY3d 1007 [2016]), the drug dealer who was the target of a misplaced shot that killed a bystander testified for the People that the day of the shooting was the last day that he sold drugs and that he had turned his life around. Subsequent to the verdict but prior to sentencing, however, the prosecutor was made aware that the witness had sold drugs to an undercover officer on the very day of his testimony, which the prosecutor brought to the attention of the court and ultimately to defense counsel. We acknowledged that the record was inadequate to ascertain when the People became aware, by imputation or otherwise, of the witness's latest drug sale, which was valid impeachment material. Nevertheless, in rejecting the Brady claim, we found that even if the information had been timely disclosed, in view of the overwhelming evidence of guilt there was no reasonable possibility that the verdict would have been different. In People v Brooks (123 AD3d 448 [1st Dept 2014], lv denied 25 NY3d 1070 [2015]), arguable discrepancies between trial witnesses and the account of a person in an undisclosed police report also did not rise to the level of exculpatory or impeachment value. In People v Hart (43 AD3d 722 [1st Dept 2007], lv denied 9 NY3d 1006 [1st Dept 2007]), where the defendant subsequently made incriminating statements, nondisclosure of a wiretapped conversation by persons unconnected to the defendant who had unsuccessfully plotted to murder the victim, and a letter by a different prosecutor seeking leniency for the victim in a different case, if disclosed, also would not have affected the verdict.
These decisions draw borders around the materiality aspect of the Brady analysis. Taken together, I think that they, and the facts of the present case, compel an affirmance. Here, when the undisclosed eyewitness was interviewed at the District Attorney's office, his recollection of the event differed significantly from his earlier account to the detective. Among other inconsistent statements, he stated that the shooter did not chase Phillips, and he no longer recalled whether there was a conversation before the shooting. The witness also claimed that he did not know who had said that the shooter was the son of one of Phillips's robbery victims. According to the prosecution, when appellate counsel asked the witness to describe the man in beige who shot Phillips, the witness's description matched defendant's height and build.
Nor were the descriptions in the report provided by the undisclosed witness closer to the time of the killing inconsistent with Davis's testimony in any material aspect such as would provide a plausible basis for a misidentification defense. That Davis described the killer's hat as a flat hat with a brim snap and the undisclosed witness described it as a "bucket hat" seems to me to be an attempted distinction without a real difference - both seem to portray a flat-topped hat. At most, there may have been minor differences in how Davis and the undisclosed witness, as judged by his statements documented in the police report, recalled aspects of the event, but these were minor distinctions that would not have undermined the consistency of the major descriptive elements. One can easily note that a daylight execution in a public place could be a shocking event, quickly concluded. This setting could easily have contributed to a minor distortion in how minor details might have been mentally processed by Davis and the undisclosed witness, and it bears repeating that Davis was attentive to actions of defendant, who had previously aroused her curiosity and possibly her suspicion. In any event, as I've noted, the two descriptions sufficiently correspond in material aspects that I do not see how a valid misidentification defense could have been presented had defendant counterpoised the respective descriptions at trial.
For this reason, I see no reasonable possibility that the evidence in this case, if it had been supplemented at trial by the undisclosed information, would have resulted in a verdict more favorable to the defense. Nor do I find a credible basis for supposing that defense counsel could have used the information to devise an alternative theory plausibly challenging the People's compellingly supported theory of the case (see People v Garrett, 23 NY3d 878, 892 [2014]).
I respectfully disagree with the majority's reliance on the recent decision in People v Rong He (34 NY3d 956 [2019]). In Rong He, a bartender who observed the assault stated that two assailants were involved and he identified the person who actually struck the victim as someone other than the defendant. This, in the first instance, sets Rong He apart from the proofs and circumstances of the present case. This statement, where there was an actual alternative identification, was not disclosed. Another witness may have identified the defendant, but at trial his testimony may have become less than reliable. The Court of Appeals concluded that if disclosed, the bartender's statement would have afforded the defendant the opportunity to challenge the People's single-assailant theory. However, while there was additional evidence presented by the prosecution, the decision strongly suggests that it was far from overwhelming. Hence, I do not conclude that our analysis should be governed by either the facts or the analysis of People v Rong He.
Finally, while I agree that the detective's directive that Davis, in viewing the video, should look for someone wearing "all brown" resulted in an unduly suggestive identification procedure (see generally People v Edmonson, 75 NY2d 672 [1990], cert denied sub nom Edmonson v New York, 498 US 1001 [1990]), the overwhelming evidence of guilt also rendered this impropriety harmless error. Davis had made reliable lineup and in-court identifications of defendant. Reynolds testified extensively about how defendant, who used his apartment as a lookout position, committed this contract murder and that he boasted about it afterward. This evidence was amply corroborated by cell phone records, surveillance video and other evidence. As I previously observed, these items of evidence neatly interlocked, even if there may have been minor, nonmaterial discrepancies that would not have detracted from the soundness and reliability of the verdict.
Order, Supreme Court, New York County (Laura A. Ward, J.), entered on or about April 23, 2018, which denied defendant's CPL 440.10 motion to vacate the judgment rendered July 7, 2015, reversed, on the law, the motion granted, and the matter remanded for a new trial. Appeal from foregoing judgment, dismissed, as academic.
Opinion by Mazzarelli, J. All concur except Tom, J. who dissents in an opinion.
Sweeny, J.P., Tom, Mazzarelli, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 19, 2019
CLERK