People v Williams (2025 NY Slip Op 04526)

People v Williams

2025 NY Slip Op 04526

Decided on July 31, 2025

Appellate Division, First Department

Manzanet-Daniels, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 31, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Lizbeth González Martin Shulman Kelly O'Neill Levy Marsha D. Michael

Index No. 787/18|Appeal No. 4201|Case No. 2019-1837|

[*1]The People of the State of New York, Respondent,
v
Darnell Williams, Defendant-Appellant.

Defendant appeals from a judgment of the Supreme Court, New York County (Melissa C. Jackson, J.), rendered October 25, 2018, convicting him, upon his plea of guilty, of assault in the first degree (three counts) and attempted robbery in the first degree (two counts), and imposing sentence.

Twyla Carter, The Legal Aid Society, New York (J.M. Boselli of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Hunter Baehren and Jennifer Westphal of counsel), for respondent.

MANZANET-DANIELS, J. 

Defendant was arrested based on his similarities in dress to a person shown on video surveillance footage depicting the vicinity shortly after the alleged crime occurred — specifically, the fact that the figure wore distinctive pants. The victim of the crime, however, described the perpetrator as wearing a black nylon jacket, with no further description of his attire; nothing other than the pants, therefore, linked defendant to the crime. Video surveillance of the alleged crime itself was "murky" and inconclusive, with the assailant's clothing described as "dark" by the investigating detective and the distinctive pants not apparent. The Department of Homeless Services (DHS) then effected an arrest of defendant at the shelter where he was residing based on the stills of the man wearing the distinctive pants provided by the police, before any confirmatory process. Under these circumstances, we dismiss the indictment for lack of probable cause. Suppression Hearing A suppression hearing was held before Justice Melissa Jackson on September 10, 2019. Detective Hostetter testified that on February 27, 2017, he was assigned to investigate an assault and attempted robbery that occurred the evening before in front of the Armenian church at 630 Second Avenue, between 34th and 35th Streets. The assailant allegedly fled when a bike messenger appeared on the scene. The complainant, who reported being attacked from behind, was unable to identify or give any description of the assailant other than he was wearing a black nylon jacket. Conspicuously missing from the description is any mention of the "distinctive ripped and patched pants" this defendant is alleged to have been wearing on the night in question.
Detective Hostetter obtained video surveillance footage from the vicinity of the attack. The only videos depicting the actual attack were obtained from the church and from 633 Second Avenue, the diner across the street from the church. By Hostetter's admission, the footage was "blurry," "murky," and of poor quality, with the quality of the 10-to-12 second video from the church being even worse than that from the diner. On cross, he agreed that the person in dark clothing was "a very small image" and that it was impossible to discern whether the victim had a white purse, as she had described. The detective agreed from these videos that he was not able to form a picture of what the perpetrator looked like, including characteristics such as age and ethnicity, or to identify anything notable about his clothing, other than it was "dark."
The detective described others "go past" in the videos, including "one person [who] comes in and out of a building," "one woman walk[ing] northbound," and "two gentlemen walk[ing] north, then south, in and out of the frame." However, the police were unable to locate the bike messenger or any eyewitnesses to the alleged crime.
The detective obtained clearer video that depicted a male individual in distinctive ripped and patched pants near the scene and heading northbound, but that video did not capture the attack (nor any other incriminating behavior, for that matter). The detective concluded that the man in the distinctive pants was the perpetrator, apparently due to temporal and geographical proximity. Notably, when shown stills from the footage, the victim was still unable to recognize defendant as her assailant. The detective did not recollect the complainant stating that her assailant fled northbound; rather, the detective surmised the same from the surveillance videos.
Detective Hostetter emailed photographic stills and a video clip from the surveillance footage — not the murky footage of the attack, but the clearer video of the person he assumed to be defendant — to a DHS sergeant at the shelter located at 400 East 30th Street, several blocks from where the assault occurred, in the hope that DHS employees would recognize the suspect. He also forwarded a wanted poster to the shelter.
On March 9, 2017 (approximately 10 days after the incident), Detective Hostetter was notified by DHS Sergeant Vazquez that DHS officers had observed defendant enter the shelter on March 3, and that he appeared to be the same person, wearing the same pants, as in the surveillance footage. Sergeant Vazquez forwarded a photograph composite taken from the shelter's cameras, which showed defendant wearing the same distinctive pants as in Detective Hostetter's surveillance stills. Detective Hostetter instructed Sergeant Vazquez to immediately inform him upon defendant's return to the shelter and to hold defendant until Detective Hostetter arrived to confirm in person that defendant was the suspect from the surveillance footage.
At around 5:00 p.m. the same day, Detective Hostetter activated a "suspect" I-card, which indicated that defendant was a suspect but that there was not probable cause for an arrest. He testified that he chose not to include probable cause in the I-card because "[He] was confident that the person in these pants and this jacket was the assailant. [He] was not, however, at the time of [his] issuing the card, 100 percent positive that [defendant] and the person depicted on [his] video were one [and] the same."
Around 10:00 p.m. that night, Sergeant Vazquez informed Detective Hostetter that defendant was at the shelter and was being held in the DHS office. When Detective Hostetter arrived at the shelter at around 10:30 p.m., he observed defendant handcuffed to a bench and was informed that DHS was also holding a red shopping bag that defendant had with him at the time of his detention.
Detective Hostetter identified defendant as the suspect from the surveillance footage, removed the DHS cuffs from defendant, replaced them with his own, and asked defendant whether the bag was his. Defendant answered in the affirmative, and Detective Hostetter transported defendant and the bag to the precinct. At the precinct, Detective Hostetter searched the bag and found a shoe box containing ripped pants matching those from the video. Thereafter, he obtained a Mirandized statement from defendant acknowledging he was the individual with the distinctive pants in the surveillance stills from the night of the crime and the photos from the shelter composite.
Defendant did not, however, admit that he was involved in the attempted robbery. Indeed, defendant denied that he was the individual depicted in the video of the actual assault — the "murky" videos obtained from the church — noting "that video is so far away you can't tell who is doing what, or who the assailant is." Defendant asked whether he was being questioned or whether he was being charged, to which the detective responded the latter. At that point, defendant informed the detective that he did not wish to speak any longer and the interview was concluded.
Defendant moved to suppress his statements and the contents of the shoe box, arguing that the People failed to show he was the perpetrator of the crime. He contended that by handcuffing and holding him for at least 30 minutes prior to Detective Hostetter's arrival, DHS arrested him without probable cause, and that all fruit of the arrest was therefore suppressible.
The People chose not to address DHS's initial physical restraint and detention of defendant, instead arguing that the statements and box contents were the fruits of a lawful arrest because Detective Hostetter had both reasonable suspicion and probable cause upon his confirmatory viewing of defendant in the DHS office.
In an oral decision immediately following arguments, the court found that, prior to his arrival at the shelter to view defendant, Detective Hostetter had at least reasonable suspicion to detain and question the individual with the distinctive pants based upon the surveillance footage. The court held that upon confirming defendant was the individual depicted in the footage, Detective Hostetter's reasonable suspicion evolved to probable cause warranting an arrest.
While the court held that DHS had reasonable suspicion to detain defendant for a reasonable period of time, it did not directly address whether DHS had probable cause to arrest defendant, holding only that DHS's 30-to-45-minute detention of defendant was reasonable under the circumstances. Nor did the court consider any alternate grounds for denial of suppression, as the People made no attenuation or intervening probable cause arguments addressing the gap in time between DHS's initial detention and Detective Hostetter's subsequent, assumedly lawful arrest.
After the court issued its decision, defendant pleaded guilty in exchange for the promised sentence of 10 years. Discussion We find that, based upon this record, DHS's handcuffing of defendant to a bench in the DHS shelter office constituted de facto arrest requiring probable cause (see People v Robinson, 282 AD2d 75, 82 [1st Dept 2001] [holding that lawful stop and frisk turned into de facto arrest where the defendant was handcuffed, transported to precinct, and held for at least two hours before being placed in lineup]; see also People v Bailey, 216 AD2d 1, 2 [1st Dept 1995], lv denied 86 NY2d 790 [1995] [investigative detention turned into full-blown arrest by placing the defendant in holding cell for approximately one hour before formally arresting her for the crime charged]).
In reaching this conclusion, we particularly note that the People presented virtually no evidence concerning the circumstances of the DHS arrest. They failed to produce a DHS witness to elicit pertinent details, such as the timing of DHS's initial stop and handcuffing of defendant and, by extension, the total length of the detention;[FN1] the identities of the officers involved and what knowledge those officers possessed prior to the arrest; whether defendant willingly came to the DHS office and waited for Detective Hostetter's arrival; and whether defendant was handcuffed willingly or posed a physical threat or flight risk (see Robinson, 282 AD2d at 80-82 [discussing various factors in determining whether a handcuffed detention qualifies as a warrantless arrest, including the length of time for which the defendant was handcuffed, whether the handcuffing was voluntary or necessary to ensure officer safety, whether the handcuffing was done while waiting for an identification procedure, the handcuffing's temporal proximity to the crime, and whether less intrusive means of detention were warranted under the circumstances]).
The People argue that the DHS arrest was based upon probable cause. The People, however, are foreclosed from raising this argument on appeal because they did not assert it before the hearing court (see People v Dodt, 61 NY2d 408, 416 [1984] [the People could not argue on appeal that the defendant voluntarily went to police station where they did not make that argument before the hearing court], lv denied 87 NY2d 1025 [1996]; see also People v Wilson, 175 AD2d 15, 16 [1st Dept 1991], lv denied 78 NY2d 1015 [1991] [the People could not argue for the first time on appeal that initial seizure of the defendant was founded on reasonable suspicion, as "[i]t is well-settled that the actions of the police may not be upheld on a theory not argued by the People in the lower court"], citing Dodt, 61 NY2d at 416; People v Johnson, 64 NY2d 617, 619 n 2 [1984]).
The People's additional theory that Detective Hostetter's in-person identification created intervening probable cause, breaking any causal connection between any illegality in defendant's initial detention and the later-acquired evidence to the hearing court, was likewise raised for the first time on appeal. Accordingly, as the hearing court did not consider this argument in its decision denying suppression, the issue is unpreserved for our review (see People v Daniel, 122 AD3d 401, 404 [1st Dept 2014] [finding the People's attenuation argument to be unpreserved where the People did not raise that argument and the hearing court's decision denying suppression did not consider any such theory], appeal dismissed 27 NY3d 1142 [2016]; see also People v Skinner, 220 AD2d 350, 351 [1st Dept 1995] ["[t]he People's argument that, since custody of defendant was transferred to an officer who undeniably had probable cause prior to the challenged identifications, the causal link between the illegal detention and the identifications was broken, is being raised for the first time on appeal, and therefore is not preserved for our review"], citing Dodt, 61 NY2d at 416]).
The doctrine of People v Garrett (23 NY3d 878, 885 n 2 [2014]) is inapplicable. Whether intervening probable cause attenuated an unlawful arrest is a "clearly separate and analytically distinct" issue from whether probable cause existed in the first instance and does not "involv[e] a single multipronged legal ruling" (id.).
Because the People failed to preserve their alternative grounds for denial of suppression, affirmance pursuant to CPL 470.15(1) is unavailable (see Daniel, 122 AD3d at 404-405 [noting that the Appellate Division is without power to affirm under CPL 470.15(1) where the People did not raise alternative argument below and the suppression court's decision did not address it]).
Because DHS arrested defendant without probable cause, all evidence flowing from the arrest, including defendant's statements and the contents of the shoe box, was unlawfully obtained and must be suppressed (see Daniel, 122 AD3d at 405 [reversing hearing court and granting suppression, as opposed to remanding for another suppression hearing]). The People are not entitled to a remand for further suppression proceedings, as they "had a full opportunity to present their case at the original hearing" and refrained from submitting alternative theories for denying suppression (People v Payton, 51 NY2d 169, 177 [1980]).
Dismissal of the indictment is the appropriate remedy in this case. The People's remaining evidence — namely, the surveillance videos showing the suspect in the area before and after the attack and Detective Hostetter's "confirmatory" identification of defendant at the shelter — is not sufficient to establish a prima facie case if the People were to try defendant upon remand. The complainant could not provide a description of her assailant, the assailant is unidentifiable in the videos showing the attack, and defendant's now-suppressed statements and pants were the only evidence connecting him to the crime scene (see People v Rossi, 80 NY2d 952, 954 [1992] [dismissing after suppressing jacket connecting the defendant to certain gambling charges where jacket was the "only link" between defendant and the gambling activities]; see also People v Hargroves, 303 AD2d 766, 766 [2d Dept 2003] [where showup identification suppressed, dismissal appropriate under particular circumstances of case where complainant could not identify assailants]).
Defendant asserts that "this Court should suppress all fruits of his unlawful arrest, vacate Mr. Williams's conviction, and remand the case for further proceedings." Under Rossi and its progeny, we find that dismissal is appropriate.
We have considered the remaining arguments and find them unavailing.
Accordingly, the judgment of the Supreme Court, New York County (Melissa C. Jackson, J.), rendered October 25, 2018, convicting defendant, upon his plea of guilty, of assault in the first degree (three counts) and attempted robbery in the first degree (two counts), and sentencing him, as a second felony offender, to an aggregate term of 10 years, should be reversed, on the law, the suppression motion granted, the judgment of conviction vacated, and the indictment dismissed.
Judgment, Supreme Court, New York County (Melissa C. Jackson, J.), rendered October 25, 2018, reversed, on the law, the suppression motion granted, the judgment of conviction vacated, and the indictment dismissed.
Opinion by Manzanet-Daniels, J. All concur.
Manzanet-Daniels, J.P., González, Shulman, O'Neill Levy, Michael, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 31, 2025

Footnotes

Footnote 1: Detective Hostetter testified that while 30 minutes passed between the DHS call informing him that defendant was being held and his arrival at the shelter, he did not ask DHS officers for how long defendant had been detained in their office. The record is therefore unclear as to when defendant was initially detained, rendering the Court's conclusion that the detention lasted between 30 and 45 minutes entirely speculative.